[ORAL ARGUMENT NOT YET SCHEDULED]

No. 17-5076

———————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

FBME BANK LTD. AND FBME LTD.,
*Plaintiffs-Appellants*

v.

STEVEN T. MNUCHIN,
in his official capacity as Secretary of the Treasury, *et al.*,
*Defendants-Appellees*

———————————

Appeal from the U.S. District Court for the District of Columbia,
No. 1:15-cv-01270-CRC, Judge Christopher R. Cooper

———————————

OPENING BRIEF OF FBME BANK LTD. AND FBME LTD.

———————————

Peter S. Spivack
J. Evans Rice III
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600


HOGAN LOVELLS US LLP


Dated: June 7, 2017

Derek L. Shaffer
William A. Burck
Jonathan G. Cooper
777 Sixth St NW, 11th Floor
Washington, DC 20001
(202) 538-8000


QUINN EMANUEL URQUHART &
SULLIVAN LLP


*Counsel for Plaintiffs-Appellants
FBME Bank Ltd. and FBME Ltd.*

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rule 28(a)(1), I hereby certify as follows:

**A.     Parties, Amici, and Intervenors**

Plaintiffs-appellants are:

- FBME Bank Ltd.;

- FBME Ltd.

Defendants-appellees are:

- Steven T. Mnuchin (in his official capacity as Secretary of the Treasury);

- U.S. Department of the Treasury;

- Jamal El-Hindi (in his official capacity as Acting Director of the Financial Crimes Enforcement Network);

- Financial Crimes Enforcement Network.

In the district court, Jacob Lew (in his official capacity as Secretary of the Treasury) and Jennifer Shasky Calvery (in her official capacity as Director of the Financial Crimes Enforcement Network) were defendants in this case until they ceased to hold office and by operation of Federal Rule of Civil Procedure 25(d) were automatically replaced as defendants by their successors in office, Steven T. Mnuchin and Jamal El-Hindi.

There were no intervenors or *amici* in the district court, and there have been none so far in this Court.

## B.    Rulings Under Review

The judicial rulings under review in this appeal are the following:

- Opinion of August 27, 2015 (Cooper, J.), Joint Appendix ("**JA**") 0045–72, reported at *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109 (D.D.C. 2015);

- Opinion and Order of November 6, 2015 (Cooper, J.), JA0091–99, reported at *FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70 (D.D.C. 2015);

- Opinion of September 20, 2016 (Cooper, J.), JA0392–456, reported at *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299 (D.D.C. 2016);

- Order of September 20, 2016 (Cooper, J.), JA0457–58;

- Memorandum Opinion of April 14, 2017 (Cooper, J.), JA0550–71, reported at *FBME Bank Ltd. v. Mnuchin*, --- F. Supp. 3d ---, 2017 WL 1379311 (D.D.C. Apr. 14, 2017);

- Order of April 14, 2017 (Cooper, J.), JA0572.

These rulings concern a rulemaking by the Financial Crimes Enforcement Network.  The Federal Register citations for the rulemaking are the following:

- 79 Fed. Reg. 42486 (July 22, 2014) (notice of proposed rulemaking), JA0589–94;

- 79 Fed. Reg. 42639 (July 22, 2014) (notice of finding), JA0595–97;

- 80 Fed. Reg. 45057 (July 29, 2015) (first rule), JA0598–606;

- 80 Fed. Reg. 74064 (Nov. 27, 2015) (proposed rule; re-opening of comment period), JA0607–10;

- 81 Fed. Reg. 18480 (Mar. 31, 2016) (second rule), JA0611–25;

- 81 Fed. Reg. 86577 (Dec. 1, 2016) (supplement to second rule), JA0626–28.

## C.    Related Cases

This case has not previously been on review before this Court or any other court, other than the district court, which issued the rulings under appeal.  Counsel is not aware of any pending related cases.

*/s/ Derek L. Shaffer*
Derek L. Shaffer

*Counsel for Plaintiffs-Appellants*
*FBME Bank Ltd. and FBME Ltd.*

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases.............................i

Table of Authorities.................................................................vii

Glossary ...............................................................................xvi

Introduction...........................................................................1

Statement of Jurisdiction...........................................................5

Statement of the Issues............................................................5

Pertinent Statutes....................................................................6

Statement of the Case ...............................................................6

    A.    Statutory Framework: § 311 of the USA PATRIOT Act .......6

        1.    Designation and special measures .................................7

        2.    Consultation and consideration....................................9

    B.    FBME ......................................................................11

        1.    Origin .......................................................................11

        2.    Presence in the United States ....................................12

        3.    Anti–money laundering compliance program .............13

        4.    Relationship with the Central Bank of Cyprus...........14

    C.    Procedural History ................................................16

        1.    Notice of finding and proposed rule............................16

        2.    First rule .................................................................19

        3.    Preliminary injunction...............................................19

4.    First remand ............................................................. 20

5.    Second rule .............................................................. 24

6.    Summary judgment .................................................... 24

7.    Second remand .......................................................... 27

8.    Final judgment and appeal .......................................... 28

Summary of the Argument ...................................................... 30

Standard of Review ................................................................ 31

Argument ............................................................................... 33

I.    Procedural Violations .................................................... 33

      A.    Withholding of Suspicious Activity Reports ......................... 33

            1.    Failure to disclose critical unclassified evidence ........ 33

            2.    *Ex parte* submission ........................................... 39

      B.    Other Notice and Comment Violations ............................... 41

      C.    Other Due Process Violations .................................... 44

            1.    Failure to mitigate use of classified evidence.............. 44

            2.    Lack of *de novo* review by neutral arbiter.................. 47

            3.    Lack of oral hearing ........................................... 49

            4.    Additional deficiencies ....................................... 52

      D.    FBME is entitled to due process ........................................ 55

II.   Violations of § 311 ........................................................ 59

      A.    Failure To Consult ................................................... 59

B.    Failure To Consider FBME's Legitimate Business..............63

III.   Arbitrariness and Caprice..............................................65

A.    Misuse of Suspicious Activity Reports..................65

1.    Lack of context ............................................66

2.    Failure to account for the Cypriot financial crisis ......71

B.    Misuse of Audit Reports.......................................73

C.    Improper Reliance on the Central Bank of Cyprus..............75

IV.   Vacatur Is Proper ........................................................79

Conclusion ........................................................................82

Certificate of Compliance

Addendum

Certificate of Service

vi

# TABLE OF AUTHORITIES

## Cases

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1986),
  *affirmed by an equally divided Court*, 484 U.S. 1 (1987) .... 3, 39, 40, 41

*Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*,
  686 F.3d 965 (9th Cir. 2012) ......................................................... 45, 47

*Allen v. Murray-Lazarus*,
  755 F. Supp. 2d 480 (S.D.N.Y. 2010) ................................................... 68

*Allina Health Services v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ............................................................ 79

*American Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................ 79

*American Medical Ass'n v. Reno*,
  57 F.3d 1129 (D.C. Cir. 1995) .............................................................. 42

*American Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) ...................................... 34, 36, 38, 43, 70

*American Vanguard Corp. v. Jackson*,
  803 F. Supp. 2d 8 (D.D.C. 2011) .......................................................... 62

*American-Arab Anti-Discrimination Committee v. Reno*,
  70 F.3d 1045 (9th Cir. 1995) ........................................................... 46, 48

*Bismullah v. Gates*,
  501 F.3d 178 (D.C. Cir. 2007) .............................................................. 47

*Bruce Packing Co., Inc. v. NLRB.*,
  795 F.3d 18 (D.C. Cir. 2015) ................................................................ 32

*Campanale & Sons, Inc. v. Evans*,
  311 F.3d 109 (1st Cir. 2002) ................................................................ 63

*Campbell v. U.S. Department of Justice,*
    164 F.3d 20 (D.C. Cir. 1998) ...............................................................33

*Chamber of Commerce of the United States v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006) .............................................................34

*Cierco v. Mnuchin,*
    --- F.3d ----, 2017 WL 2231107 (D.C. Cir. 2017) ..........................7, 8, 58

*Collier v. Bradley University,*
    113 F. Supp. 2d 1235 (C.D. Ill. 2000) .................................................68

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009).................................................................73

*Concrete Pipe & Products of California, Inc. v.*
    *Construction Laborers Pension Trust,*
    508 U.S. 602 (1993)......................................................................48, 49

*Diabo v. Secretary of Health, Education & Welfare,*
    627 F.2d 278 (D.C. Cir. 1980) .............................................................54

*District Hospital Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015).........................................................65, 74

*FBME Bank Ltd. v. Lew* ("**FBME I**"),
    125 F. Supp. 3d 109 (D.D.C. 2015) ...............................19, 20, 32, 40, 44

*FBME Bank Ltd. v. Lew* ("**FBME II**"),
    142 F. Supp. 3d 70 (D.D.C. 2015)...................................................20, 80

*FBME Bank Ltd. v. Lew* ("**FBME III**"),
    209 F. Supp. 3d 299 (D.D.C. 2016)...............1, 25, 26, 27, 36, 37, 38, 39,
    ...................................................... 42, 43, 45, 49, 55, 57, 60,
    ...................................................... 61, 64, 67, 69, 70, 72, 80

*FBME Bank Ltd. v. Mnuchin* ("**FBME IV**"),
    --- F. Supp. 3d ----, 2017 WL 1379311 (D.D.C. Apr. 14, 2017) . 29, 39, 54

*Food Marketing Institute v. ICC,*
　　578 F.2d 1285 (D.C. Cir. 1979) ............................................................. 33

*Goldberg v. Kelly,*
　　397 U.S. 254 (1970) .............................................................................. 50

*Gray Panthers v. Schweiker,*
　　652 F.2d 146 (D.C. Cir. 1980) ......................................................... 50, 52

*Greene v. McElroy,*
　　360 U.S. 474 (1959) ................................................................. 35, 55, 56

*Halverson v. Slater,*
　　129 F.3d 180 (D.C. Cir. 1997) ............................................................. 62

*Heartland Regional Medical Center v. Sebelius,*
　　566 F.3d 193 (D.C. Cir. 2009) ............................................................. 79

*Holland v. National Mining Ass'n,*
　　309 F.3d 808 (D.C. Cir. 2002) ............................................................. 31

*In re Complaint of Judicial Misconduct,*
　　687 F.3d 1188 (9th Cir. 2012) ............................................................ 69

*International Brotherhood of Teamsters v. United States,*
　　431 U.S. 324 (1977) .............................................................................. 66

*International Refugee Assistance Project v. Trump,*
　　--- F.3d ----, 2017 WL 2273306 (4th Cir. May 25, 2017) (*en banc*) ....... 33

*Iowa League of Cities v. EPA,*
　　711 F.3d 844 (8th Cir. 2013) .............................................................. 32

*Jifry v. FAA,*
　　370 F.3d 1174 (D.C. Cir. 2004) ...................................................... 35, 45

*Joint Anti-Fascist Refugee Committee v. McGrath,*
　　341 U.S. 123 (1951) .............................................................................. 58

*Judulang v. Holder,*
   132 S. Ct. 476 (2011)................................................................32

*Karuk Tribe of California v. U.S. Forest Service,*
   681 F.3d 1006 (9th Cir. 2012) (*en banc*)................................63

*Kiareldeen v. Ashcroft,*
   273 F.3d 542 (3d Cir. 2001) ............................................46, 47

*KindHearts for Charitable Humanitarian Development, Inc. v. Geithner,*
   710 F. Supp. 2d 637 (N.D. Ohio 2010)...........................45, 47

*Latif v. Lynch,*
   2016 WL 1239925 (D. Or. Mar. 28, 2016) ............................47

*League of Women Voters of the United States v. Newby,*
   --- F. Supp. 3d ----, 2017 WL 1273895 (D.D.C. Feb. 24, 2017) ............62

*Mai v. Carolina Holdings, Inc.,*
   696 S.E.2d 769 (N.C. Ct. App. 2010) ....................................57

*Mathews v. Eldridge,*
   424 U.S. 319 (1976)..........................................................51, 52

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015)............................................................65

*National Council of Resistance of Iran v. U.S. Department of State,*
   251 F.3d 192 (D.C. Cir. 2001).................................35, 57, 58

*People's Mojahedin Organization of Iran v. Department of State,*
   327 F.3d 1238 (D.C. Cir. 2003)..............................................45

*People's Mojahedin Organization of Iran v. U.S. Department of State,*
   182 F.3d 17 (D.C. Cir. 1999).............................................55, 56

*People's Mojahedin Organization of Iran v. U.S. Department of State,*
   613 F.3d 220 (D.C. Cir. 2010).................................35, 44, 45

*Phillips v. Washington Legal Foundation*,
  524 U.S. 156 (1998)................................................................57

*Portland Cement Ass'n v. Ruckelshaus*,
  486 F.2d 375 (D.C. Cir. 1973)..............................................34

*Professional Air Traffic Controllers Organization v. FLRA*,
  672 F.2d 109 (D.C. Cir. 1982)..............................................53

*Public Citizen v. Federal Motor Carrier Safety Administration*,
  374 F.3d 1209 (D.C. Cir. 2004)............................................63

*Rafeedie v. INS*,
  795 F. Supp. 13 (D.D.C. 1992)..............................................46

*Ralls Corp. v. Committee on Foreign Investment in the United States*,
  758 F.3d 296 (D.C. Cir. 2014)..............................2, 35, 36, 38

*Ralpho v. Bell*,
  569 F.2d 607 (D.C. Cir. 1977)..............................................35

*Smith v. Simpson*,
  133 S.E.2d 474 (N.C. 1963)..................................................59

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*,
  85 F. Supp. 3d 197 (D.D.C. 2015)..........................................80

*States Marine Lines, Inc. v. Federal Maritime Commission*,
  376 F.2d 230 (D.C. Cir. 1967)..............................2, 36, 37, 38

*Tolan v. Cotton*,
  134 S. Ct. 1861 (2014)........................................................59

*U.S. Department of the Interior v. FERC*,
  952 F.2d 538 (D.C. Cir. 1992)..............................................64

*U.S. Telecom Ass'n v. FCC*,
  359 F.3d 554 (D.C. Cir. 2004)..............................................61

*United States v. Archer,*
    671 F.3d 149 (2d Cir. 2011) .................................................. 66

*United States v. Giordano,*
    416 U.S. 505 (1974).............................................................. 62

*Van Bourg v. Nitze,*
    388 F.2d 557 (D.C. Cir. 1967) .............................................. 47

*Walter O. Boswell Memorial Hospital v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984) .............................................. 70

*Wint v. Yeutter,*
    902 F.2d 76 (D.C. Cir. 1990) ................................................ 33

*Wirtz v. Baldor Electric Co.,*
    337 F.2d 518 (D.C. Cir. 1963) ........................................ 35, 40

*Wisconsin v. Constantineau,*
    400 U.S. 433 (1971).............................................................. 58

*Withrow v. Larkin,*
    421 U.S. 35 (1975)........................................................... 47, 48

*Zevallos v. Obama,*
    793 F.3d 106 (D.C. Cir. 2015) .............................................. 78

*Zweibon v. Mitchell,*
    516 F.2d 594 (D.C. Cir. 1975) (*en banc*) .............................. 33

**Statutes**

USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001)
    § 302(b)(5) ............................................................................ 11
    § 302(b)(6) ...................................................................... 11, 42
    § 311(f) ............................................................................ 34, 41
    § 311 .......................... 1, 4, 6, 7, 8, 9, 16, 27, 30, 41, 42, 46, 56, 59, 62, 63
    31 U.S.C. § 5318A ................................................................. 6
    31 U.S.C. § 5318A(a)(1) ........................................................ 7
    31 U.S.C. § 5318A(a)(2)(c) ................................................... 11
    31 U.S.C. § 5318A(a)(4)(A) ....................................... 10, 59, 61

31 U.S.C. § 5318A(a)(4)(B) ............................................................... 10
31 U.S.C. § 5318A(a)(4)(B)(iii) ................................................ 10, 63
31 U.S.C. § 5318A(b)(1)–(4) ............................................................. 7
31 U.S.C. § 5318A(b)(5) ....................................... 7, 10, 59, 61
31 U.S.C. § 5318A(c)(1) .................................... 10, 59, 61
31 U.S.C. § 5318A(c)(2) ............................................................ 51
31 U.S.C. § 5318A(c)(2)(B) ......................................................... 10
31 U.S.C. § 5318A(c)(2)(B)(i) ................................................... 64
31 U.S.C. § 5318A(c)(2)(B)(ii) .......................................... 10, 63
31 U.S.C. § 5318A(f) ...................................................... 34, 41

5 U.S.C. § 553(b)–(c) ........................................................... 42

5 U.S.C. § 706(2)(A) ........................................................... 32

5 U.S.C. § 706(2)(B) ........................................................... 32

5 U.S.C. § 706(2)(D) ........................................................... 32

8 U.S.C. § 1534(e)(3) .......................................................... 47

28 U.S.C. § 1291 ................................................................... 5

28 U.S.C. § 1331 ................................................................... 5

31 U.S.C. § 310(a) ................................................................. 7

31 U.S.C. § 5318(g) ..................................................... 41, 71

## Rules

Federal Rule of Appellate Procedure 4(a)(1)(B) ........................................ 5

North Carolina Rule of Professional Conduct 1.15 ............................... 57

## Other Authorities

31 C.F.R. § 1020.320(a) .................................................. 2, 65

71 Fed. Reg. 38202 (July 5, 2006) ....................................... 62

73 Fed. Reg. 19452 (Apr. 10, 2008) ...................................... 8

76 Fed. Reg. 45689 (Aug. 1, 2011).................................................................8

77 Fed. Reg. 59747 (Oct. 1, 2012) .................................................................8

79 Fed. Reg. 42486 (July 22, 2014) ......................................................... 16, 80

79 Fed. Reg. 42639 (July 22, 2014) ................................ 16, 17, 21, 36, 67

80 Fed. Reg. 45057 (July 29, 2015) ......................................................... 19, 80

80 Fed. Reg. 60575 (Oct. 7, 2015) .................................................................8

80 Fed. Reg. 74064 (Nov. 27, 2015).............................................................20

81 Fed. Reg. 11496 (Mar. 4, 2016) ...............................................................8

81 Fed. Reg. 14408 (Mar. 17, 2016) .............................................................8

81 Fed. Reg. 18480 (Mar. 31, 2016) ...............1, 23, 24, 41, 43, 50, 51, 53,
..............................................................59, 60, 72, 73, 74, 76, 77

81 Fed. Reg. 86577 (Dec. 1, 2016) ...................3, 27, 28, 69, 70, 71, 72, 73

81 Fed. Reg. 9139 (Feb. 24, 2016) .................................................................8

*A Fearful Number*, THE ECONOMIST (June 4, 2015),
    https://goo.gl/kZXz6a .............................................................................9

Central Bank of Cyprus—Organisational Chart,
    https://goo.gl/GO3DPL............................................................................23

Code of Conduct for United States Judges, Canon 3(A)(4) ...................40

David Cole, *Enemy Aliens*,
    54 Stan. L. Rev. 953 (2002) ....................................................................46

FinCEN, 311 Special Measures,
    https://goo.gl/Jvohgq ...............................................................................8

H.R. Conf. Rep. 108-381 (2003)........................................................... 46, 56

inCyprus, *Cyprus Court Rejects FBME Bank Liquidation*
(May 10, 2017), https://goo.gl/I8miDO ................................................ 15

MONEYVAL, *Report on Fourth Assessment Visit* 15 (Sept. 27, 2011),
https://goo.gl/UHO9U6 ........................................................................ 78

Treasury Order 180-01 (July 1, 2014),
https://goo.gl/xQARSA ................................................................... 7, 62

U.S. Government Accountability Office, GAO-08-1058,
*USA PATRIOT Act: Better Interagency Coordination and*
*Implementing Guidance for Section 311 Could Improve*
*U.S. Anti-Money Laundering Efforts* (Sept. 2008),
https://goo.gl/hWYpbm .......................................................................... 9

# GLOSSARY

| | |
|---|---|
| **AML** | Anti–money laundering |
| **CBC** | Central Bank of Cyprus |
| **EY** | Ernst & Young |
| **FBME** | FBME Bank Ltd. |
| **FinCEN** | Financial Crimes Enforcement Network |
| **IOLTA** | Interest on Lawyer Trust Account |
| **JA** | Joint Appendix |
| **MONEYVAL** | Committee of Experts on the Evaluation of Anti-Money Laundering and the Financing of Terrorism. |
| **SARs** | Suspicious activity reports |

## INTRODUCTION

This case involves a suspect exercise of extraordinary administrative powers under the USA PATRIOT Act.  Under § 311 of that Act, the Financial Crimes Enforcement Network ("**FinCEN**"), a bureau of the U.S. Department of the Treasury, has designated FBME Bank Ltd. ("**FBME**" or "**Bank**") of "primary money laundering concern" and imposed a lethal "special measure" that cuts FBME off from U.S. dollars.  81 Fed. Reg. 18480 (Mar. 31, 2016) ("**Rule**").  This punishment results from a "sort of quasi-adjudicative rulemaking process in which the agency may rely on classified information unavailable to the target of the rule or the public."  *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 309 (D.D.C. 2016).  Because "[n]either the D.C. Circuit nor any other court has had occasion to weigh in on" the questions here posed, "the [District] Court" had to "navigat[e] without a detailed roadmap."  *Id.* at 312.  This case affords the Court its first chance to elucidate the operative framework, and, in so doing, to correct worrisome aspects of FinCEN's approach to imposing § 311 against foreign banks.

The Rule FinCEN issued against FBME is unsustainable both procedurally and substantively.  To begin with, FinCEN based the Rule

1

largely on secret evidence submitted *ex parte* below—evidence that FBME still has never seen.  The complete contents of FinCEN's black box of secret evidence remain unknown to FBME.  What we know is that much of the content is *un*classified—particularly suspicious activity reports ("**SARs**"), which a financial institution files for any transaction it "knows, suspects, or has reason to suspect" involves a "possible violation of law or regulation."  31 C.F.R. § 1020.320(a). FinCEN relied on secret SARs filed by other banks to conclude FBME engaged in hundreds of millions of dollars of questionable transactions. Unable to examine those SARs, FBME has never been able to challenge FinCEN's account of them.

Withholding these SARs defies the "fundamental" precept that "an accused should not be subjected to punishment on the basis of secret evidence," *States Marine Lines, Inc. v. Federal Maritime Commission*, 376 F.2d 230, 239 (D.C. Cir. 1967), as well as this Court's repeated pronouncements that, particularly when an agency uses classified information to sanction an entity, it must release *all* of the *un*classified evidence.  *E.g.*, *Ralls Corp. v. Committee on Foreign Investment in the United States*, 758 F.3d 296, 317–21 (D.C. Cir. 2014) (collecting cases).

By condoning such one-sided submissions, the lower court violated the "firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *affirmed by an equally divided Court*, 484 U.S. 1 (1987).

FinCEN also made arbitrary and capricious use of the aggregate SARs data. Although SARs are naturally filed on transactions by even the healthiest banks, FinCEN referenced no comparative baseline or point of comparison indicating whether FBME's SARs rate was better, worse, or on par with peer banks. All indications, however, are that FBME compares favorably. Indeed, FinCEN refused to compare FBME's SARs rate against similarly situated banks by claiming the comparison "would not necessarily portray the relevant risk posed by FBME"—suggesting it would make FBME look *better* than FinCEN desires. 81 Fed. Reg. 86577, 86579 (Dec. 1, 2016).

FinCEN went still further to rig its rulemaking against FBME. It withheld critical allegations until after comments closed; it relied on undisclosed classified information without granting FBME or its counsel rudimentary access consistent with due process; and it refused

3

to provide a neutral arbiter or live hearing so that FBME might meaningfully challenge the Rule and its premises.

FinCEN also disregarded statutory constraints. Section 311 requires FinCEN to undertake three levels of consultation with specified officials, yet FinCEN never consulted those officials. Nor did the agency consider express statutory factors, particularly the extent of FBME's legitimate business.

The substance of the Rule is equally lacking. Besides misusing the SARs data, FinCEN credited evidence from a demonstrably biased source, the Central Bank of Cyprus. And FinCEN failed to account for contrary evidence that FBME submitted: When the Bank disproved the few specifics FinCEN offered, the agency acknowledged only trifling mistakes. Simply put, FinCEN refused to allow the facts to get in the way of its foreordained outcome.

We respectfully submit that this foreign bank stands innocent of FinCEN's charges and undeserving of the penalty imposed. At the very least, however, FBME deserves meaningful opportunity to make its case and have it considered before being excommunicated. Absent relief from this Court, such opportunity will never come.

4

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and entered final judgment on April 14, 2017.  JA0572.  This Court has jurisdiction under 28 U.S.C. § 1291.

FBME appealed three days after final judgment, JA0573–74, well within the applicable 60-day limit set by Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether the Rule is procedurally deficient because it is based on (a) secret unclassified evidence that was submitted *ex parte* but never disclosed to FBME and (b) unclassified allegations that FBME did not receive notice of until the Rule issued, well after the window to comment had closed.

2.     Whether the Rule violates due process because (a) it is based on classified materials that FinCEN submitted *ex parte* to the district court without affording FBME meaningful opportunity for challenge; (b) a neutral adjudicator never reviewed *de novo* all of the factual and legal issues; (c) FBME never received a live hearing; and (d) the

cumulative effect of the above, coupled with further procedural problems, rendered the process infirm.

3.    Whether the Rule violates § 311 because FinCEN failed to (a) conduct specified consultations and (b) consider the extent of FBME's legitimate business.

4.    Whether the Rule is arbitrary and capricious because it (a) relies on data presented arbitrarily without any baseline or context; (b) relies heavily on data from an unreliable source; and (c) ignores or misconstrues contrary evidence.

## PERTINENT STATUTES

This case concerns § 311 of the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), which is codified at 31 U.S.C. § 5318A. The statutory text is set forth in the addendum at the end of this brief.

## STATEMENT OF THE CASE

### A.    Statutory Framework:  § 311 of the USA PATRIOT Act

Section 311 empowers the Secretary of the Treasury effectively to destroy a foreign bank.  The Secretary has delegated responsibility for administering § 311 to FinCEN, *see* Treasury Order 180-01 § 3(a) (July

1, 2014), https://goo.gl/xQARSA,[1] a "bureau in the Department of the Treasury," 31 U.S.C. § 310(a).

### 1.    Designation and special measures

Under § 311, FinCEN may impose "special measures" on a foreign bank it designates as being "of primary money laundering concern."  31 U.S.C. § 5318A(a)(1).  The statute authorizes five special measures. The first four are relatively mundane, requiring extra recordkeeping and reporting.  *See* § 5318A(b)(1)–(4).

"The fifth, and most severe, measure that FinCEN may take against a foreign institution is to prohibit the 'opening or maintaining in the United States of a correspondent account or payable-through account by any domestic financial institution . . . for or on behalf of [that] foreign banking institution." *Cierco v. Mnuchin*, --- F.3d ----, 2017 WL 2231107, at *2 (D.C. Cir. 2017) (quoting 31 U.S.C. § 5318A(b)(5)). "[I]mposing this measure has the effect of eliminating or curtailing a foreign banking institution's access to the U.S. financial system and to transactions involving the U.S. dollar." *Id.* (citation omitted).  Because international banks typically cannot function without U.S. dollars, "the

---

[1]  We have shrunk website links using Google's URL shortener, https://goo.gl.

fifth special measure can be a 'death sentence' for smaller foreign banks who depend on access to U.S. dollar clearing through correspondent accounts." *Id.* (citation and quotation marks omitted).

Since § 311's enactment, 18 foreign banks (other than FBME) have faced the fifth special measure. *See* FinCEN, 311 Special Measures, https://goo.gl/Jvohgq (collecting all § 311 actions). At least 12 of the 18 collapsed or were liquidated after FinCEN proposed the fifth special measure—usually before the measure was finalized. *See* 81 Fed. Reg. 14408, 14409 (Mar. 17, 2016) (JSC CredexBank); 81 Fed. Reg. 11496, 11497 (Mar. 4, 2016) (Banca Privada d'Andorra); 81 Fed. Reg. 9139, 9139 (Feb. 24, 2016) (Liberty Reserve); 80 Fed. Reg. 60575, 60576 (Oct. 7, 2015) (Lebanese Canadian Bank); 77 Fed. Reg. 59747, 59748 (Oct. 1, 2012) (Asia Wealth Bank & Myanmar Mayflower Bank); 76 Fed. Reg. 45689, 45690 (Aug. 1, 2011) (VEF Banka); 73 Fed. Reg. 19452, 19453 (Apr. 10, 2008) (First Merchant Bank & four subsidiaries).

FinCEN exercises its deadly § 311 power in unprincipled yet politically opportune ways. After examining FinCEN's implementation record, the U.S. Government Accountability Office reported that U.S. and foreign officials "felt that there were several financial institutions

8

of greater money laundering concern that had not been targeted and suggested that Treasury targeted financial institutions that were politically expedient rather than financial institutions that were of the greatest concern."  U.S. Government Accountability Office, GAO-08-1058, *USA PATRIOT Act: Better Interagency Coordination and Implementing Guidance for Section 311 Could Improve U.S. Anti-Money Laundering Efforts* 26 (Sept. 2008), https://goo.gl/hWYpbm.  "For example, officials we spoke with about two countries we visited where financial institutions were identified for Section 311 actions told us that other banks in those countries had anti-money laundering controls that were as bad as, or worse than the banks that were targeted.  They noted that it was not clear why Treasury chose the banks it chose as targets for Section 311 action."  *Id.*; *see also A Fearful Number*, THE ECONOMIST (June 4, 2015), https://goo.gl/kZXz6a (describing how FinCEN applies § 311 "in a political way").

### 2.     Consultation and consideration

Before identifying a "primary money laundering concern," FinCEN must satisfy two statutory prerequisites:  consultation and consideration.  FinCEN must "consult with the Secretary of State and

9

the Attorney General." 31 U.S.C. § 5318A(c)(1). It must also "consider" three statutory factors, § 5318A(c)(2)(B), including "the extent to which" the bank is "used for legitimate business purposes," § 5318A(c)(2)(B)(ii).

When selecting a special measure, FinCEN must engage in a second round of consultation and consideration. For this round, FinCEN must "consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency . . . [,] the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the National Credit Union Administration Board," and "such other agencies and interested parties" as FinCEN "may find to be appropriate." § 5318A(a)(4)(A). FinCEN must also "consider" four statutory factors, § 5318A(a)(4)(B), including "the extent to which the action or the timing of the action would have a significant adverse systemic impact" on the "legitimate business activities" of the bank, § 5318A(a)(4)(B)(iii).

If FinCEN opts for the fifth special measure, then a third round of consultation (unique to this measure) is required, this time with "the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System." § 5318A(b)(5).

10

Another peculiar aspect of the fifth special measure is that it "may be imposed only by regulation." § 5318A(a)(2)(c). Congress's "purpose" was to ensure that FinCEN complies with "the safeguards provided by the Administrative Procedure Act" ("**APA**") and allows "appropriate opportunity for comment by affected financial institutions." USA PATRIOT Act, § 302(b)(5) & (b)(6), 115 Stat. at 297.

### B.    FBME

#### 1.    Origin

FBME is an international commercial bank that operates primarily in Cyprus, with headquarters in Tanzania. JA1548. As of mid-2014, it had some $2 billion in assets. JA1548.

The Bank's roots date back to 1952, when the Saab family established one of Lebanon's first banks. JA1547. By 1982, Lebanon was besieged by civil war and Syrian occupation; the Saabs—as members of the Lebanese-Christian minority—feared nationalization by Syrian forces. JA1547–48. To protect their family business, they relocated to Cyprus, which was close to Lebanon but secure, and they established FBME (then called the Federal Bank of the Middle East) as

11

a subsidiary of their Lebanese bank.  JA1454, 1547–48.  A few years

later, FBME was spun off as a separate entity.  JA1548.

Over the years, the Saabs repeatedly sought to incorporate FBME

in Cyprus, but each time the Central Bank of Cyprus denied their

request, insisting that FBME remain an "offshore bank."  JA1821–23.

FBME eventually incorporated in Tanzania because that was the most

politically stable country in Africa, had strong macroeconomic

indicators, and presented an opportunity for FBME to provide domestic

banking services.  JA1822.

## 2.    Presence in the United States

FBME has substantial connections to the United States.  As of

2015, over 150 of its customers resided or operated here, and it

maintained accounts with approximately 30 companies headquartered

here.  JA1550.

FBME also owns property in the United States.  In 2010, Johns

Gamewell, LLC, a property management firm, borrowed $5.5 million

from FBME, secured by liens on land in the Coves at Round Mountain,

a North Carolina residential community.  JA0200–01.  Whenever an

encumbered lot is sold, FBME receives a portion of the sale and releases its lien.  JA0201.

For years, Gamewell transferred sale proceeds to FBME in Cyprus; after FinCEN proposed its Rule in 2014, however, Gamewell's transfers were blocked.  JA0201–02, 0586.  With dollars accumulating but no way to send them to Cyprus, the parties arranged to hold the funds in escrow in a local attorney's IOLTA account (Interest on Lawyer Trust Account).  JA0202.  FBME currently has liens on approximately 600 acres of land and over $290,000 in the North Carolina IOLTA account.  JA0202, 0586, 1136.

### 3.  Anti–money laundering compliance program

FBME has a robust, bank-wide, anti–money laundering ("**AML**") compliance program.  JA1293–1311, 1360–67, 1841–47.  The program has consistently evolved to reflect ever-changing legal requirements.  JA1841.

FBME regularly retains experts at the Big Four accounting firms to audit its AML program.  A 2011 Ernst & Young ("**EY**") audit concluded that FBME's compliance program satisfied all applicable requirements.  JA1847–48.  A 2013 KPMG audit likewise confirmed

13

that "FBME basically fulfills the requirements as set out by the Cyprus regulator and is in principle in compliance with [European Union] standards." JA1148.

Beyond meeting applicable regulatory requirements, FBME took prompt action to implement any recommendations auditors made for enhancing its compliance program. JA1369–1371, 1850–52, 1874–1904. For example, based on recommendations in the 2013 KPMG audit, FBME changed its risk-assessment procedures, appointed an alternate compliance officer, amended its policy manual, upgraded its core banking software, and implemented additional procedures to enhance its know-your-customer process. JA1850, 1874–90.

## 4.    Relationship with the Central Bank of Cyprus

FBME's primary regulator in Cyprus is the Central Bank of Cyprus ("**CBC**"). Even though FBME has operated in Cyprus for over 30 years, CBC has long treated FBME selectively and unfairly. JA1821–25. In 2009 and 2010, for example, CBC singled out FBME, demanding certain documents on an arbitrarily short timeframe, and then fining FBME when it was slightly delayed in submitting the documents. JA1825. In 2014, CBC illegally fined FBME for supposedly

failing to follow certain capital controls imposed as a consequence of the 2013 Cypriot financial crisis; this fine occasioned an ongoing lawsuit between FBME and CBC.  JA1827–30.

More recently, after FinCEN proposed the fifth special measure, CBC hatched an illegal plan to destroy FBME and siphon its assets for the Cypriot government's own use.  As part of this plan, CBC seized control of FBME's Cyprus branch, appointed a Special Administrator to oversee the branch, and initiated liquidation proceedings.  JA0581–84, 1831–35.  On May 10, 2017, a Cypriot court rejected CBC's attempt to liquidate FBME.  inCyprus, *Cyprus Court Rejects FBME Bank Liquidation* (May 10, 2017), https://goo.gl/I8miDO.

Outside observers have denounced CBC's illegal actions and its attempts to seize FBME's deposits for its own purposes.  For example, Tanzania's central bank appointed a statutory manager, Lawrence Mafuru, to oversee FBME.  JA0583.  Mr. Mafuru reports that CBC's Special Administrator said he wanted "to access [FBME's] funds so [the Special Administrator] can keep them as cover for potential damages that the Central Bank of Cyprus or the Republic may have to pay," which Mr. Mafuru took as a "clear sign that these funds that you so

15

badly want to access are not to pay back the depositors to whom the money belongs but for other uses." JA1721.

CBC's actions have severely injured FBME and violated both Cypriot and international law. Accordingly, FBME's shareholders commenced multiple lawsuits against CBC in Cyprus and initiated an arbitration against Cyprus in the International Chamber of Commerce in Paris for damages estimated to be at least $500 million. JA1378–82, 1552. As a primary defense, CBC has invoked these proceedings and forecasted that FinCEN's Rule would independently seal the demise of FBME. JA1838. The Parisian arbitration and Cypriot lawsuits are ongoing.

### C.    Procedural History

#### 1.    Notice of finding and proposed rule

On July 22, 2014, FinCEN published a notice designating FBME an institution of primary money laundering concern under § 311. 79 Fed. Reg. 42639 (July 22, 2014) ("**Notice of Finding**"), JA0595–97. That same day, FinCEN proposed a rule imposing the fifth special measure. 79 Fed. Reg. 42486 (July 22, 2014), JA0589–94.

16

The Notice of Finding generally accused FBME of having "facilitated a substantial volume of money laundering through the Bank for many years" and having weak "AML controls."  79 Fed. Reg. at 42639.  Drawing on SARs, FinCEN accused FBME of facilitating over 4,500 suspicious wire transfers totaling $1.262 billion between November 2006 and April 2014.  *Id.* at 42640.  The Notice also singled out a handful of specific transactions, accusing FBME of, for example, having a customer receive a deposit from a Lebanese Hezbollah financier in 2008, and facilitating the transfer of $100,000 from a phishing attack in 2010.  *Id.* at 42639–40.

Throughout the following year, FBME submitted multiple comments to FinCEN that charted numerous steps FBME had taken to enhance its AML programs and explained why the fifth special measure was unwarranted.  JA1293–1320, 1358–83, 1481–83, 1498–1502.

In particular, FBME submitted two reports refuting the Notice of Finding's allegations.  Following the Notice, FBME retained EY to assess its entire AML compliance program.  In a report dated September 22, 2014, EY concluded that FBME's AML program satisfies all applicable European Union and Cypriot requirements.  JA1321–25.

17

That report also recommended further AML improvements beyond what the law required, which FBME swiftly sought to implement. JA1369–71, 1460–64, 1850–52, 1891–1904.

Separately, EY investigated each of the specific transactions flagged in the Notice. JA1373–77, 1384–1447. The resulting December 2014 report shows a pattern of conduct quite different from FinCEN's portrayal. Many of FinCEN's allegations were unsubstantiated; for example, EY found no connection between an FBME customer and Lebanese Hezbollah. JA1375, 1390–93. Where the alleged transactions had occurred, EY found that FBME had in place appropriate due-diligence procedures, addressed suspicious transactions, and, when warranted, took appropriate responsive actions. JA1373–74. For the 2010 phishing incident, for example, as soon as FBME had learned the transfer was fraudulent, it suspended the account in question, investigated, and then returned the funds, closed the account, and filed a suspicious transaction report with Cypriot authorities. JA1375, 1398–1400.

18

### 2.    First rule

Nevertheless, on July 29, 2015, FinCEN finalized its rule imposing the fifth special measure.  80 Fed. Reg. 45057 (July 29, 2015), JA0598–606.  Despite the extensive contrary evidence, FinCEN concluded that "the statements made in the [Notice of Finding] remain true and accurate, and that FBME is of 'primary money laundering concern.'"  *Id.* at 45060.

### 3.    Preliminary injunction

FBME sued seeking a preliminary injunction, which was granted one day before the first rule would have taken effect.  JA0044; *FBME Bank Ltd. v. Lew* ("**FBME I**"), 125 F. Supp. 3d 109 (D.D.C. 2015), JA0045–72.

In opposing the motion, the Government had "filed numerous unclassified documents," which FinCEN had "relied upon" but not "disclosed to FBME previously."  *FBME I*, 125 F. Supp. 3d at 120.  The court concluded that FinCEN had thereby likely violated the APA both by providing "insufficient notice of non-classified, non-protected information during the rulemaking proceeding," and by failing "to adequately consider at least one potentially significant, viable, and

19

obvious alternative to the sanction it imposed." *Id.* at 118; *see also id.* at 120–25.

### 4.    First remand

"Rather than appeal the injunction, move for reconsideration, or continue to defend its rulemaking," FinCEN sought a "do-over": a voluntary remand, which the district court granted, over FBME's objections (including objections that FinCEN would continue to withhold SARs and other unclassified evidence). *FBME Bank Ltd. v. Lew* ("**FBME II**"), 142 F. Supp. 3d 70, 72 (D.D.C. 2015), JA0091–99.

On remand, FinCEN re-opened the rulemaking and invited comments. 80 Fed. Reg. 74064 (Nov. 27, 2015) ("**2015 Notice**"), JA0607–10. Crucially, the 2015 Notice did not invoke any new allegation postdating the 2014 Notice of Finding.

FBME submitted a lengthy comment, backed by voluminous exhibits and support from other commenters. JA1801–73. FBME's comment went point-by-point through each allegation in the Notice of Finding, explaining why each was wrong, outdated, or unsubstantiated, as demonstrated by EY's reports and follow-up evidence FBME compiled. JA1853–57. The comment also highlighted KMPG and EY's

findings that FBME's AML program complied with all applicable laws, and it described additional AML improvements FBME had made per auditors' recommendations.  JA1847–52.

FBME specially faulted FinCEN's reliance on SARs, which underlay the Notice of Finding's allegations about the volume of suspicious transactions FBME had supposedly facilitated.  JA1857–60. FBME demanded disclosure of the SARs so that it could verify FinCEN's figures.  JA1860–61.  FBME also demanded context for the numbers:  Between November 2006 and April 2014, FBME conducted over 900,000 wire transfers involving over $124 billion (JA1858–59); according to FinCEN, fewer than 1% (accounting for $1.262 billion) triggered a SAR (79 Fed. Reg. at 42640).  Whether this SARs rate was high, low, or on par with other banks was unknown.  JA1859–63. Moreover, FinCEN failed to account for the impact of the 2013 Cypriot financial crisis (and resulting financial controls), even though that appeared to explain a big, isolated spike in FBME's reported SARs rate for 2013–2014.  JA1858–59.

FBME also documented at length the Central Bank of Cyprus's bias and unreliability.  JA1821–35.  Especially troubling was a report

by CBC, supposedly based on its 2014 annual examination of FBME. In June and July 2014, CBC together with PricewaterhouseCoopers conducted a three-week on-site examination. JA1728. On the final day (July 4), the auditors informed FBME they had found no significant issues and their report would issue that month. JA1728, 1750. Once FinCEN published the Notice of Finding on July 22, however, CBC sought to seize control of FBME's Cyprus branch and sell it, which led FBME to initiate its legal proceedings against CBC. JA1750. In response, CBC reopened the annual examination and sent in a new audit team to further inspect FBME in August 2014. JA1750. Over a year later, in September 2015, CBC produced a report, supposedly based on the 2014 examination, that attacked FBME's AML procedures. JA1692–1718.[2] Tellingly, although PricewaterhouseCoopers had been hired to conduct the audit, it neither authored nor reviewed the resulting report. JA1753. Instead, CBC jettisoned PricewaterhouseCoopers and wrote the report itself to rationalize its illegal attempts to seize FBME's assets for itself and to mitigate its litigation exposure. JA1750–51.

---

[2] In February 2015, CBC secretly sent FinCEN a longer version of this report. *See infra* Section I.C.4.

Other public comments reinforced FBME's concerns. *See* 81 Fed. Reg. at 18487 (describing comments). In particular, a former Governor of CBC[3] observed that Cypriot politics best explain the campaign against FBME. "During my tenure," he noted, "there was considerable evidence in the public domain that certain politicians were uncomfortable with FBME's presence in Cyprus" as they favored "domestic banks." JA1799. He suspected that "the diminished independence of the central bank and the toxic politics alluded to above may well have contaminated the decision making process at the CBC, pushing it away from strict banking considerations and into the realm of party and interest group politics," and that "FinCEN itself may have received misleading or inaccurate information about FBME from Cypriot sources, since a small bank like FBME may be a convenient scapegoat." JA1800.

Even more remarkably, investigators whom FBME had retained to work with undersigned counsel were solicited and paid by Cypriot officials to turn against FBME and report privileged communications to FinCEN. JA0705–10, 0731–32, 0938. Only after FinCEN had reviewed

---

[3] The Governor is the head of CBC. *See* Central Bank of Cyprus—Organisational Chart, https://goo.gl/GO3DPL.

23

and sat on those secret submissions for months did it first alert FBME, which responded by expressing grave concern about the resulting taint and by noting that CBC's underhanded machinations further confirmed its bias against FBME.  JA0701, 0705–17.

### 5.    Second rule

In March 2016, FinCEN issued a new final rule, which again imposed the fifth special measure.  81 Fed. Reg. 18480 (Mar. 31, 2016) ("**Rule**"), JA0611–25.  Incredibly, the Rule contained brand new accusations never previously disclosed to FBME, including:

- Three assertions that "in late 2014, FBME employees took various measures to obscure information."  *Id.* at 18482, 18486, 18489.

- Five assertions that, "as of early 2015, an alleged Hezbollah associate and the Tanzanian company he managed owned accounts at FBME."  *Id.* at 18482; *see also id.* at 18483, 18484, 18488, and 18489.

These allegations blindsided FBME.  Although they concerned conduct predating the re-opening of the rulemaking, the 2015 Notice had not disclosed them.

### 6.    Summary judgment

After the Rule issued, the parties cross-moved for summary judgment, which the district court granted and denied in part.  JA0457–

24

58; *FBME Bank Ltd. v. Lew* ("**FBME III**"), 209 F. Supp. 3d 299 (D.D.C. 2016), JA0392–456.

The court first held that FinCEN could rely on and withhold unclassified SARs because the Rule was (supposedly) based *solely* on "aggregate data drawn from the SARs," which were reported in the Notice of Finding, and was "*not* based" on any "particular instances of activity reported in particular, withheld SARs." *FBME* III, 209 F. Supp. 3d at 331 (emphasis added); *see also id.* at 316–17. (In complete contradiction, the court stated later that it "understands FinCEN to be saying, in essence, that it has examined not only aggregate SARs data, but the particular characteristics of the SARs generated and the entities involved in those transactions." *Id.* at 332–33.)

Next, the court concluded that FinCEN had unlawfully failed to give FBME notice or meaningfully opportunity to comment on the new allegations that FBME had obscured information in late 2014 and had maintained an account for a Hezbollah associate in early 2015. *Id.* at 318–22. Chastising FinCEN, the court explained that the agency's habit of continually revealing new information only after comments closed is "hardly a best practice, because it carries with it the taint of

25

unfair surprise." *Id.* at 321.  Ultimately, however, the court deemed these notice errors harmless on the theory that any comment by FBME would not have changed anything.  *Id.* at 319, 321–22.

The district court also found that FinCEN had failed "to respond meaningfully to FBME's comments regarding the agency's treatment of aggregate SARs data." *Id.* at 331.  It faulted FinCEN for neither providing "comparative benchmarks" to support FinCEN's "assertions that FBME has a 'large number' of shell company customers or that the Bank has facilitated a 'high volume' of U.S. dollar transactions by such shell companies," nor explaining "why such benchmarks may be unnecessary, or infeasible to provide, or how else the agency may have applied its expertise and regulatory experience in the absence of specific benchmarks." *Id.* at 333 (citation omitted).  The court further faulted FinCEN for ignoring FBME's comment that its SARs rate was artificially inflated due to "the Cypriot financial crisis and related regulations." *Id.* at 333–34.  In "failing to respond to these material comments," the court concluded, the Rule was "arbitrary and capricious." *Id.* at 334.

The court rejected a number of FBME's other arguments. Among other things, it concluded that FinCEN had: fulfilled its consultation obligations under § 311; satisfied due process; lawfully relied on information from CBC; permissibly construed the EY and KPMG audits; and adequately considered the extent of FBME's legitimate business. *Id.* at 325, 328–31, 334–38. These rulings are discussed in the Argument section below.

### 7.   Second remand

To remedy FinCEN's arbitrary-and-capricious failure to respond to FBME's comments regarding aggregate SARs data, the court remanded a second time on this one point. *Id.* at 342–43.

On remand, FinCEN did not reopen the rulemaking, accept input, or provide renewed notice. Instead, it took two months to publish a two-page supplement purporting to refute FBME's comments about the SARs data. 81 Fed. Reg. 86577 (Dec. 1, 2016) ("**Supplement**"), JA0626–28.

In the Supplement, FinCEN continued to withhold any benchmark or other means to compare FBME's SARs rate against similarly situated banks. Instead, FinCEN insisted that the volume of

SARs for FBME is "substantial" in "absolute terms" and that providing comparative benchmarks "would not necessarily portray the relevant risk posed by FBME," but would "set a target for banks or customers wishing to evade money laundering controls." *Id.* at 86578–79.

FinCEN also refused to reconsider its use of SARs in light of the confounding effect of financial controls resulting from the Cypriot financial crisis, finding "no reason to assume that any renewed focus on Cypriot financial controls would decrease rather than increase the credibility of SAR filings . . . to such an extent as to undermine its finding of a substantial volume of shell company activity at FBME." *Id.* at 86578.

Notably, the Supplement emphasized that FinCEN had "analyzed the SARs as *qualitative* evidence" that FBME was facilitating suspicious transactions, not simply as *quantitative* evidence. *Id.* at 86577 (emphasis added).

### 8.    Final judgment and appeal

Following the second remand, the district court concluded that "the third time really is the charm" and that, in the Supplement, "FinCEN has now adequately responded to FBME's significant

28

comments in promulgating the Second Final Rule." *FBME Bank Ltd. v. Mnuchin* ("**FBME IV**"), --- F. Supp. 3d ----, 2017 WL 1379311, at *1, *8 (D.D.C. Apr. 14, 2017), JA0550–71. The court accepted FinCEN's arguments that a comparative benchmark was "unnecessary" and that any confounding effect of the Cypriot financial crisis was irrelevant. *Id.* at *7.

The district court also accepted FinCEN's new emphasis on the contents—rather than the number—of SARs: "total SARs numbers, as FinCEN has since made clear, were not even central to its analysis. Rather, the agency focused on the *nature* of the SARs—the shell company transactions, the lack of transparency, and other signals of money laundering." *Id.* at *7.

With that, the district court entered final judgment for FinCEN, JA0572, before staying the Rule for fourteen days, JA0576. FBME timely appealed to this court, JA0573–74, and sought an emergency stay, which this Court denied on April 28, JA0588. The Rule entered effect on May 1.

## SUMMARY OF THE ARGUMENT

FinCEN's Rule results from an unfair, unlawful process. FinCEN formulated the Rule using secret unclassified evidence that was submitted *ex parte* to the district court but never disclosed to FBME; such hiding of the ball violates the demands of both the APA and due process that an agency disclose the unclassified material relied on so that affected parties can meaningfully engage it. Similarly, FinCEN impermissibly withheld key allegations from FBME until issuing the Rule, after opportunity to challenge those allegations had long passed. Such egregious notice deprivation can never be "harmless" where classified evidence is playing a pivotal role, and certainly not in the circumstances present here.

In addition, FinCEN relied critically on classified evidence, but it did not allow FBME or its counsel the rudimentary access due process requires. Nor did FinCEN provide a neutral adjudicator, oral hearing, or any semblance of due process. All told, the cumulative effect of these and other deficiencies robbed FBME of the fair hearing it deserves.

FinCEN also violated § 311. The statute requires FinCEN to engage in multiple rounds of consultation with specified officials before

imposing the fifth special measure, but FinCEN consulted none of them. The statute further required FinCEN to consider the extent of FBME's legitimate business, but FinCEN blew past that too.

Finally, the Rule's substance is arbitrary and capricious. FinCEN drew heavily on SARs statistics presented in a vacuum, without benefit of any comparative benchmark or baseline that might render the statistics meaningful, and without any accounting for the confounding effect of the Cypriot financial crisis. FinCEN also unlawfully ignored or misconstrued the contrary evidence FBME submitted from independent auditors KPMG and Ernst & Young, which expressly concluded that FBME's anti–money laundering program fully complied with the law. Finally, FinCEN improperly credited findings of CBC, even though that source was thoroughly and demonstrably biased against FBME, to the point of having a pronounced pecuniary interest in seeing the Rule imposed.

## STANDARD OF REVIEW

In reviewing FinCEN's Rule, this Court "accord[s] no particular deference to the judgment of the District Court." *Holland v. National Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002).

Procedural claims are reviewed *de novo*.  *See* 5 U.S.C. § 706(2)(B), (D); *Bruce Packing Co., Inc. v. NLRB.*, 795 F.3d 18, 22 (D.C. Cir. 2015) (reviewing "due process claim de novo"); *Iowa League of Cities v. EPA*, 711 F.3d 844, 872 (8th Cir. 2013) (reviewing APA procedural claim *de novo*).  This procedural review should be more probing than usual, as "FinCEN's reliance on nonpublic and classified evidence to impose a serious sanction against a single institution required it to hew even more closely to the APA's demands than it might have in a garden-variety rulemaking." *FBME I*, 125 F. Supp. 3d at 114.

Substantive claims are reviewed under the arbitrary-and-capricious standard.  *See* 5 U.S.C. § 706(2)(A).  Under this standard, a court "is not to substitute its judgment for that of the agency," but "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (quotation marks omitted).  Heightened substantive scrutiny is warranted here because the Rule was twice remanded only for FinCEN to twice reiterate the same result.  In such situations, this Court has applied a "somewhat greater degree of scrutiny" to ensure that the "agency's action on remand" is "more than a barren exercise of

32

supplying reasons to support a pre-ordained result." *Food Marketing Institute v. ICC*, 578 F.2d 1285, 1289–90 (D.C. Cir. 1979); *accord Wint v. Yeutter*, 902 F.2d 76, 81 (D.C. Cir. 1990) (Judge R. B. Ginsburg).

Much as the Government may naturally invoke deference, "deference is not equivalent to acquiescence." *Campbell v. U.S. Department of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). Even when the Government invokes "national security," courts remain obliged to say what the law is, especially when constitutional rights are at stake. *Zweibon v. Mitchell*, 516 F.2d 594, 604–05 (D.C. Cir. 1975) (*en banc*) (plurality opinion); *International Refugee Assistance Project v. Trump*, --- F.3d ----, 2017 WL 2273306, at *13, 24 (4th Cir. May 25, 2017) (*en banc*) (refusing to defer to Presidential judgment that national security justifies ban on travelers from certain countries).

## ARGUMENT

## I.   Procedural Violations

### A.   Withholding of Suspicious Activity Reports

#### 1.   Failure to disclose critical unclassified evidence

FinCEN cannot predicate its rule on secret, *un*classified evidence. "It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of . . . data that, [to a] critical degree, is

known only to the agency." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973)).  This Court has repeatedly held that the APA requires agencies to release all "critical factual material" relied on in a rulemaking.  *E.g.*, *id.* at 236–40; *Chamber of Commerce of the United States v. SEC*, 443 F.3d 890, 899– 908 (D.C. Cir. 2006).  Separately, § 311(f) of the USA PATRIOT Act authorizes FinCEN to submit "classified information" to "the reviewing court ex parte and in camera," but does *not* authorize "ex parte" use of *un*classified information.  31 U.S.C. § 5318A(f).  It follows that the APA obligated FinCEN to disclose *all* of the critical unclassified materials animating the Rule.

Due process likewise forbids agencies from relying on secret unclassified evidence.  It is an "immutable" principle, applicable even in "administrative and regulatory actions," that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."  *Greene v. McElroy*, 360 U.S. 474,

496–97 (1959); *accord Ralpho v. Bell*, 569 F.2d 607, 628–29 (D.C. Cir. 1977); *Wirtz v. Baldor Electric Co.*, 337 F.2d 518, 528 (D.C. Cir. 1963). There is one exception for one category of information:  classified information that must remain secret for the sake of national security need not always be disclosed.  *See Jifry v. FAA*, 370 F.3d 1174, 1182–84 (D.C. Cir. 2004).  At the same time, "due process requires, at the least," that "an affected party" receive "access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls Corp. v. Committee on Foreign Investment in the United States*, 758 F.3d 296, 319 (D.C. Cir. 2014); *accord People's Mojahedin Organization of Iran v. U.S. Department of State* ("***People's Mojahedin III***"), 613 F.3d 220, 227–30 (D.C. Cir. 2010); *National Council of Resistance of Iran v. U.S. Department of State*, 251 F.3d 192, 208–09 (D.C. Cir. 2001).[4]

FinCEN relied on SARs to claim that FBME facilitated 4,500 suspicious wire transfers totaling at least $875 million between November 2006 and March 2013, and facilitated a further $387 million in suspicious transfers from April 2013 through April 2014.  79 Fed.

---

[4]  As discussed below in Section I.D, FBME is entitled to due process.

35

Reg. at 42640. "These summary statistics," the district court found, "formed important cornerstones in FinCEN's analysis." *FBME III*, 209 F. Supp. 3d at 334. Indeed, the court emphasized that "FinCEN's analysis of SARs data appears *central* to its assessment" of the extent of FBME's wrongdoing. *Id.* at 333 (emphasis added).

Nevertheless, FinCEN refused to disclose these unclassified SARs to FBME. This refusal to turn over critical, unclassified evidence violates both the APA and due process, as explained in *American Radio Relay*, *Ralls*, and the other cases cited above.

Especially instructive is this Court's decision in *States Marine Lines, Inc. v. Federal Maritime Commission*, holding that due process forbids any administrative sanction resting on secret third-party complaints (such as SARs). 376 F.2d 230 (D.C. Cir. 1967). The Federal Maritime Commission had approved a system whereby shippers set rules and self-policed by filing complaints about each other for resolution by an accounting firm known as the "Neutral Body." *Id.* at 232–33. To encourage participation, written complaints were kept secret; all the Neutral Body would supply was a summary of the evidence "in sufficient detail to enable the accused to rebut it." *Id.* at

36

237–39.  This Court ruled that this scheme violated the principle that "an accused should not be subjected to punishment on the basis of secret evidence."  *Id.* at 239.  Only by receiving "all the evidence *in its original form*"—not just in a summary—could the accused be assured that an adverse decision was not based on secret evidence.  *Id.* at 239–40 (emphasis added).  *States Marine Lines* controls this case:  Just as the Federal Maritime Commission could not, consistent with due process, approve a system in which parties were sanctioned based on third-party complaints not disclosed in their original form, neither could FinCEN rely on withheld SARs to punish FBME.

The district court nevertheless licensed FinCEN to rely on and withhold individual SARs, reasoning that the Rule is based solely "on the aggregate data drawn from the SARs, which was made public in the [Notice of Finding]," rather than on "particular instances of activity reported in particular, withheld SARs."  *FBME III*, 209 F. Supp. 3d at 331; *id.* at 316–17.  That ruling is as unsustainable as it is unprecedented.  Without seeing the transactions and data underlying FinCEN's aggregate report, FBME cannot verify—let alone contest— "important cornerstones in FinCEN's analysis," such as how FBME

supposedly facilitated over 4,500 suspicious transactions totaling $1.262 billion in 2006–2014. *Id.* at 334. Presenting only top-line conclusions while withholding underlying data is incompatible with *American Radio Relay* and like cases, which hold that the "technical studies and data upon which the agency relies" must be produced to enable affected parties "to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." 524 F.3d at 236 (citations omitted). The district court's ruling also contravenes both *Ralls*, which mandates disclosure of all "unclassified evidence on which the official actor relied," 758 F.3d at 319, and *States Marine Lines*, which forbids administrative punishment based on secret third-party complaints, even when a summary is provided, 376 F.2d at 239–40.

Moreover, the premise of the ruling—that FinCEN considered only aggregate SARs data and not the contents of particular SARs—is wrong, as the district court elsewhere acknowledged. A few pages after asserting that FinCEN relied only on aggregate data, *FBME III*, 209 F. Supp. 3d at 316–17, 331, the court concluded the opposite, characterizing FinCEN as "saying, in essence, that it has examined not only aggregate SARs data, but the particular characteristics of the

38

SARs generated and the entities involved in those transactions," *id.* at 332–33. After reviewing the Supplement, the court confirmed this view, stating that "total SARs numbers, as FinCEN has since made clear, were not even central to its analysis. Rather, the agency focused on the *nature* of the SARs—the shell company transactions, the lack of transparency, and other signals of money laundering." *FBME IV*, 2017 WL 1379311, at *7. In other words, the agency *did* rely on the contents and nature of particular SARs—particular SARs that FBME never saw. In this sense, the district court has already refuted its own prior ruling that SARs can be withheld because FinCEN relied solely on aggregate data made public in the Notice of Finding.

## 2. *Ex parte* submission

By affirming the Rule based on SARs that FinCEN submitted *ex parte*, the district court separately violated "the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *affirmed by an equally divided Court*, 484 U.S. 1 (1987).

39

*Abourezk* identified three exceptions—each inapplicable here—to this general rule:  (1) classified information protected by the state secrets privilege; (2) statutes authorizing *ex parte* submissions; and (3) parties asserting privilege "*to prevent use* of the materials in the litigation."  *Id.* (emphasis added).  So, if an agency claims privilege over unclassified material, and no statute authorizes its *ex parte* submission, it "has an option:  it can hold back [the] material, and take the risk of not being able to prove its case, or it can produce the material and allow it to be the subject of direct and cross-examination."  *Wirtz*, 337 F.2d at 528.  What an agency cannot do is wield privilege as both a sword and a shield—simultaneously relying on unclassified materials submitted *ex parte* while refusing to disclose them to affected parties.  *See also* Code of Conduct for United States Judges, Canon 3(A)(4) (forbidding judges from considering substantive *ex parte* communications, except as "authorized by law").

No statute authorizes FinCEN to rely on SARs and submit them *ex parte* to the court.  The Government claims that the Bank Secrecy Act requires FinCEN to *withhold* SARs in certain circumstances, *see FBME I*, 125 F. Supp. 3d at 120 & n.4, but it is indisputable that the

Act does not authorize FinCEN to *selectively disclose* SARs via *ex parte* submission.  *See* 31 U.S.C. § 5318(g).  Further cutting against FinCEN is § 311(f), which explicitly authorizes "ex parte" submission of "classified information" in a § 311 proceeding, but *not* of *un*classified evidence.  31 U.S.C. § 5318A(f).  Had Congress wished to empower FinCEN to use unclassified SARs *ex parte* in a § 311 proceeding, it would have so specified.  Because it has not granted such statutory authorization, the "main rule" of *Abourezk* controls and forecloses FinCEN from submitting SARs *ex parte* as it did.  785 F.2d at 1060–61.

## B.    Other Notice and Comment Violations

Beyond the SARs, FinCEN withheld key allegations only to disclose them after comments concluded.  The Rule contained brand new allegations never previously disclosed to FBME, including that: (1) "in late 2014, FBME employees took various measures to obscure information," and (2) "[a]s of early 2015, an alleged Hezbollah associate and the Tanzanian company he managed owned accounts at FBME." 81 Fed. Reg. at 18482.  These allegations were not included in the Notice of Finding, the first rule, or otherwise in the public

41

administrative record.[5]  Only when FinCEN issued the Rule in March 2016 did FBME first receive notice of these allegations—well after the close of comments.

FinCEN thus denied FBME (and the public) opportunity to comment on critical accusations, contrary to its fundamental APA notice obligation.  5 U.S.C. § 553(b)–(c); *American Medical Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995); *see also* USA PATRIOT Act, § 302(b)(6), 115 Stat. at 297 (a purpose of § 311 rulemakings is to ensure "appropriate opportunity for comment by affected financial institutions").  The district court recognized as much in ruling that FinCEN's failure to notify FBME of these accusations amounted to "two defects in the notice and opportunity for comment FinCEN afforded FBME."  *FBME III*, 209 F. Supp. 3d at 341.  It nonetheless found these notice violations harmless.  *Id.* at 319–20.

The district court was correct about the notice violations, but wrong about their harmlessness.  These allegations mattered to the Rule.  *Three times* FinCEN stated in the Rule that, "in late 2014, FBME

---

[5]  The heavily redacted version of the Hezbollah allegation that FinCEN released before comments closed effectively withheld notice of the substantive charge.  *FBME III*, 209 F. Supp. 3d at 321.

employees took various measures to obscure information." 81 Fed. Reg. at 18482, 18486, 18489. *Five times* it stated that an alleged Hezbollah associate and the Tanzanian company he managed owned accounts at FBME. *Id.* at 18482, 18483, 18484, 18488, and 18489. FinCEN would not have stressed these allegations if they were immaterial. Even the district court agreed that the new Hezbollah allegation "appears somewhat important in its own regard: As FBME observes, it appears five times in the Second Final Rule." *FBME III*, 209 F. Supp. 3d at 321.

Had FinCEN provided notice of these specific allegations earlier, FBME would have investigated internally and commented on them externally in detail, just as it did with *every other* allegation FinCEN ever raised. *See* JA1853–57. FBME thus would have "something useful to say" about these allegations if given the chance to comment, which is all that is required to show that a notice failure is not harmless. *American Radio Relay*, 524 F.3d at 237–38 (citation omitted). Indeed, FBME's continued engagement with regulators in Tanzania and Cyprus may well have enabled it to shine light on and discredit the likely source and motives behind the new allegations.

43

More fundamentally, harm should be presumed here. This Court has "cast doubt" on whether, when an agency sanction rests in part on classified evidence, the withholding of unclassified material *ever* "could be found harmless." *People's Mojahedin III*, 613 F.3d at 229 n.6. Because a "convincing response" to "the unclassified material might affect the Secretary's view not only of that evidence but of the classified material as well," this Court has "declined to consider whether the record nevertheless substantially supported the Secretary's determination." *Id.* The district correct rightly adhered to this precedent in its initial decision granting the preliminary injunction, *FBME I,* 125 F. Supp. 3d at 123, before deviating at the last moment. This Court should stay true to its indication in *People's Mojahedin III* and rule that withholding key, unclassified allegations cannot be harmless.

### C.    Other Due Process Violations

#### 1.    Failure to mitigate use of classified evidence

FinCEN further violated due process by failing to mitigate its use of classified evidence. In a series of cases in the early 2000s, this Court held that when an agency sanctions an entity based on both classified

and unclassified evidence, due process requires disclosure only of unclassified materials. *E.g.*, *Jifry*, 370 F.3d at 1183–84; *People's Mojahedin Organization of Iran v. Department of State* ("**People's Mojahedin II**"), 327 F.3d 1238, 1242 (D.C. Cir. 2003). After reviewing these decisions, this Court concluded in 2010 that "none" of them "decides whether an administrative decision relying *critically* on undisclosed classified material would comport with due process because in none was the classified record essential . . . ." *People's Mojahedin III*, 613 F.3d at 231 (emphasis added). According to the district court, this Rule "is based, in potentially crucial respects, on classified information." *FBME III*, 209 F. Supp. 3d at 312. This appeal thus poses the question left open in *People's Mojahedin III*: whether due process requires access to critical classified materials that drive an administrative sanction.

Although this Court has not decided this issue, other courts require some sort of access. *Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965, 982–84 (9th Cir. 2012); *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*, 710 F. Supp. 2d 637, 659 (N.D. Ohio 2010) (collecting cases) ("Courts have . . . requir[ed] disclosure of classified information to give a party

45

an ability to respond to allegations made against it."). The risk of erroneous deprivation is simply too high when punishment rests on untested classified evidence. *See American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1069–70 (9th Cir. 1995); *Rafeedie v. INS*, 795 F. Supp. 13, 18–21 (D.D.C. 1992). After all, adversarial testing of classified evidence often exposes it as flimsy and rebuttable once known. *E.g.*, *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548–49 (3d Cir. 2001); David Cole, *Enemy Aliens*, 54 Stan. L. Rev. 953, 1001–02 (2002) (noting cases).

Congress agrees. When Congress amended § 311 in 2003 to authorize *ex parte* submission of classified information, the accompanying conference report stated that, when the Government submits classified materials *ex parte*, "the Conferees intend that a court will fashion procedures, necessary to assure a moving party due process of law, that resemble those already required in similar situations in which the government . . . seeks to base a claim or defense on classified information." H.R. Conf. Rep. 108-381, at 55 (2003).

Three procedures are typically used to mitigate the Government's use of classified information: (1) declassifying materials that need not

be classified; (2) presenting an adequate unclassified summary of classified materials; and (3) granting security-cleared counsel access on an attorneys'-eyes-only basis to material that cannot be declassified or adequately summarized.[6]  To vindicate FBME's due-process rights, this Court should require at least *some* mitigation measure.  Here, FBME was afforded *none*.  Absent relief, FBME will never have a meaningful opportunity to rebut the critical classified evidence used to punish it.

### 2.    Lack of *de novo* review by neutral arbiter

Although an agency that combines investigative and adjudicative functions generally need not provide an independent neutral arbiter, *Withrow v. Larkin*, 421 U.S. 35, 46–55 (1975), exception arises when the record is compiled through "nonadversarial processes," *id.* at 58.  The general premise is that adversarial process will afford a sanctioned

---

[6]    *See, e.g.*, 8 U.S.C. § 1534(e)(3) (summaries & security-cleared counsel); *Bismullah v. Gates*, 501 F.3d 178, 187 (D.C. Cir. 2007) (security-cleared counsel); *Van Bourg v. Nitze*, 388 F.2d 557, 564 (D.C. Cir. 1967) (declassification and summaries); *Al Haramain*, 686 F.3d at 982–84 (summaries & security-cleared counsel); *Kiareldeen*, 273 F.3d at 548 (summaries); *KindHearts*, 710 F. Supp. 2d at 660 (declassification, summaries, and security-cleared counsel); *Latif v. Lynch*, 2016 WL 1239925, at *18–19 (D. Or. Mar. 28, 2016) (summaries & security-cleared counsel).

entity fair opportunity to contest the agency's evidence.  *Id.* at 40 n.3, 53–55.

Absent a fully adversarial process, a due-process problem is posed by the same agency investigating and adjudicating:  "Clearly, if the initial view of the facts based on the evidence derived from *nonadversarial processes*," and if those findings "as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision," then "a substantial due process question would be raised."  *Withrow*, 421 U.S. at 58 (emphasis added).  Relying on secret evidence is the kind of nonadversarial process that poses due-process problems:  "the very foundation of the adversary process assumes that the use of undisclosed information will violate due process because of the risk of error."  *American-Arab Anti-Discrimination Committee*, 70 F.3d at 1069.

The solution for this due-process problem, the Supreme Court instructs, is to provide "for a neutral adjudicator to conduct a *de novo* review of all factual and legal issues."  *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 618 (1993) (citation and quotation marks omitted).  An independent

48

neutral adjudicator can overcome any due-process problem in an initial

agency decision, but the review must be *de novo*—if the review is

deferential (*e.g.*, if findings could be reversed only if "unreasonable or

clearly erroneous"), then the "substantial question of procedural

fairness under the Due Process Clause" remains.  *Id.* at 626.

Here, FinCEN punished FBME based on secret evidence (both

classified and unclassified) that FBME could never contest through an

adversary proceeding.  Nor has there been a subsequent corrective

review:  Although Judge Cooper was a neutral arbiter, he reviewed the

Rule with great deference, not *de novo*.  *FBME III*, 209 F. Supp. 3d at

310.  Given FinCEN's nonadversarial process, due process demands

that an independent arbiter review *de novo* the whole record to ensure

that imposition of the fifth special measure is lawful.  No such neutral

review has occurred.

### 3.    Lack of oral hearing

Due process similarly requires that FinCEN provide FBME an

oral hearing before imposing the fifth special measure.  When an agency

takes an *adjudicatory* action—which FinCEN's rulemaking effectively

was, *see FBME III*, 209 F. Supp. 3d at 309—courts usually consider oral

hearings necessary. *E.g.*, *Gray Panthers v. Schweiker*, 652 F.2d 146, 159–73 (D.C. Cir. 1980) (collecting cases). As the Supreme Court has pointed out, "written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

The problem is especially pronounced in this case. For example, FinCEN faulted FBME for not "provid[ing] meaningful information" about its AML improvements, 81 Fed. Reg. at 18483, even though FBME made numerous submissions on this subject (*e.g.*, JA1369–71, 1460–64, 1850–52, 1874–1904), and repeatedly asked if further information was needed (*e.g.*, JA0193, 0195, 0199–200, 1801–02), only to receive "no requests" (JA1505). If FinCEN nonetheless thought more "meaningful information" was needed, then FBME could have addressed that at a live hearing. But FinCEN's process doomed FBME by suggesting only after the fact what more it desired.

Whether written submissions suffice depends upon case-specific application of the considerations set forth in *Mathews v. Eldridge*, which held an oral hearing unnecessary before suspension of disability

50

benefits. 424 U.S. 319, 349 (1976). Written submissions sufficed there because (1) the disability recipient knew "with particularly the information relevant to the entitlement decision"; (2) the information could be "communicate[d] more effectively through written documents"; and (3) the recipient's representative had "full access to *all* information relied upon." *Id.* at 345–46 (emphasis added). The recipient could thus "'mold' his argument to respond to the precise issues which the decisionmaker regards as crucial." *Id.* at 346.

The circumstances in this case are diametrically opposed. First, FBME does not know what information FinCEN deems relevant. Section 311 allows FinCEN to "consider" *any* "information [it] determines to be relevant," 31 U.S.C. § 5318A(c)(2), and FinCEN has made a mystery of what it deems relevant, despite FBME's repeated inquiries, JA1501–06. Second, a critical justification for the Rule is FinCEN's conclusion that FBME is untrustworthy whereas CBC is credible: "FinCEN does not believe FBME" will, if ordered, "provide accurate, credible, and reliable information." 81 Fed. Reg. at 18489; *see also id.* at 18485, 18487–88 (rejecting concerns about CBC's "credibility"). Determinations of a party's "credibility" are "peculiarly

51

suitable" to oral hearings. *Gray Panthers*, 652 F.2d at 169–70. Last, but not least, FBME obviously did not have access to "all information" relied on by FinCEN—in particular, the SARs and classified materials. *Mathews*, 424 U.S. at 346. Due process thus required that FBME receive an oral hearing to have a fair chance at molding its arguments to the issues FinCEN regards as important.

### 4. Additional deficiencies

Two additional deficiencies rendered FinCEN's process especially unfair: (1) taint from FinCEN's receipt of privileged materials; and (2) concealment of a February 2015 report that FinCEN received from CBC and relied on.

***Privileged Materials***: On February 1, 2016, FinCEN disclosed that in August 2015 it had received affidavits from disgruntled former investigators of FBME containing FBME's privileged communications. JA0701, 0749–0949. After entering into a fee dispute with FBME, the investigators became paid agents of CBC and apparently submitted the privileged communications at CBC's direction. JA0705–10, 0731–32, 0938. FinCEN then sat on these privileged materials for months without informing FBME.

52

Although FinCEN ultimately asserted that it did not "consider[] the [privileged materials] as part" of its rulemaking, 81 Fed. Reg. at 18487 n.16, the veracity of this statement cannot be confirmed from the record, and the heavy emphasis the Rule places on information sourced from CBC points to precisely the opposite conclusion.  Ordinarily, when an agency rulemaking is exposed to taint, the agency must conduct an evidentiary hearing and make findings to determine if a new rulemaking is necessary.  *Professional Air Traffic Controllers Organization v. FLRA*, 672 F.2d 109, 113 & n.7 (D.C. Cir. 1982). FinCEN's failure to do so leaves open the troubling prospect that the Rule has been tainted by FinCEN's review of FBME's privileged communications.

**February 2015 Report**:  FinCEN also concealed a February 2015 report prepared by CBC, while *affirmatively* representing that the report was *not* in its possession.  When CBC's and PricewaterhouseCoopers' 2014 on-site audit of FBME concluded, FBME repeatedly sought a copy of the findings, yet was denied access at every turn.  In particular, on September 17, 2015, FinCEN's counsel assured FBME that:

53

> I am now able to say with respect to the Pricewaterhouse
> Cooper audits you asked us about, to the best of our
> knowledge FinCEN does not have them in its possession and
> therefore does not plan to rely on them.

JA1683.  Conspicuously, the very next day (September 18, 2015), CBC for the first time provided FBME with a 27-page report purportedly resulting from the 2014 audit.  JA1692–1718.

In December 2016, however, FBME's Cypriot counsel uncovered correspondence showing that CBC had in fact sent FinCEN a more extensive 48-page version of the report months earlier, on *February 13, 2015*.  JA0464, 0484–0531.  The district court ultimately indicated it was fine for FinCEN to withhold the February 2015 report as classified without giving FBME any access, *see FBME IV*, 2017 WL 1379311, at *9, but we respectfully disagree, *see* Section I.C.1, above.

Even if none of these procedural deficiencies identified by FBME were fatal by itself, their "cumulative effect" denied FBME the "full and fair hearing to which [it] is entitled."  *See Diabo v. Secretary of Health, Education & Welfare*, 627 F.2d 278, 283–84 (D.C. Cir. 1980) (Tamm, J., concurring).

### D.    FBME is entitled to due process

The district court correctly assumed that FBME is entitled to due process, *FBME III*, 209 F. Supp. 3d at 326–28, but it doubted this assumption given this Court's prior holding that "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *People's Mojahedin Organization of Iran v. U.S. Department of State* ("***People's Mojahedin I***"), 182 F.3d 17, 22 (D.C. Cir. 1999). Governing law confirms that FBME is entitled to due process.

***First***, courts should construe statutes authorizing agency actions against individuals as granting minimum due-process protections to those individuals, unless Congress explicitly provides otherwise. As the Supreme Court held in *Greene v. McElroy*: "Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process," out of "concern that traditional forms of fair procedure not be restricted by implication or without the most explicit action by the Nation's lawmakers, even in areas where it is possible that the Constitution

55

presents no inhibition." 360 U.S. at 507–08 (collecting cases).

Therefore, "even in areas where it is possible" that the Constitution

may not apply, courts still should apply "the traditional safeguards of

due process," unless "the Nation's lawmakers" have explicitly stated

otherwise.

Nothing in § 311 expresses any intent to withhold due process. To

the contrary, Congress indicated in the conference report that it

"intend[s]" that courts applying § 311 "will fashion procedures,

necessary to assure a moving party due process of law . . . ." H.R. Conf.

Rep. 108-381, at 55. That confirms the *Greene v. Mcelroy* presumption:

Congress intended for due-process protections to be statutorily built

into § 311.

***Second***, FBME in any event has sufficient connections to the

United States to satisfy *People's Mojahedin I.* Before FinCEN finalized

the Rule, FBME had 150 American customers and maintained accounts

with 30 American companies. JA1550. FBME also holds liens on

roughly 600 acres and over $290,000 in North Carolina. JA0200–02,

56

0586, 1136.[7]  These connections to the United States surpass those that this Court found sufficient in *National Council*, where the plaintiff merely had an "overt presence within the National Press Building in Washington, D.C." plus a claimed "interest in a small bank account." 251 F.3d at 200–03.

In nonetheless doubting there was a sufficient nexus between FBME's property in the United States and the deprivation caused by the Rule, *see FBME III*, 209 F. Supp. 3d at 328, the district court conflated two distinct issues.  Whether a complainant sufficiently connects to the United States to invoke due process is analytically separate from whether  governmental action deprives that entity of a protected interest.  *See National Council*, 251 F.3d at 200–05 (treating these questions separately).  With respect to the first question, FBME's large bank account, liens, and connections to U.S. companies amply suffice.  *See id.* at 200–03.  As for the second question, the Rule's stigmatizing designation of FBME as "of primary money laundering

---

[7]    FBME's funds in the IOLTA account are its "property," *see Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164–72 (1998); North Carolina Rule of Professional Conduct 1.15 (IOLTA funds are "client property"), as are its real-estate liens, *see Mai v. Carolina Holdings, Inc.*, 696 S.E.2d 769, 773 (N.C. Ct. App. 2010).

concern," coupled with its deprivation of FBME's preexisting rights to
open and maintain correspondent bank accounts, easily trigger due
process. *See id.* at 203–05 (designating foreign entities as terrorist
organizations and eliminating their right to hold bank accounts triggers
due process); *see also Joint Anti-Fascist Refugee Committee v. McGrath*,
341 U.S. 123 (1951) (designating entity as communist triggers due
process); *Wisconsin v. Constantineau*, 400 U.S. 433, 435–37 (1971)
(labeling individual a drunkard and prohibiting alcohol purchases
triggers due process).  Indeed, the deprivation is so severe that it
ordinarily amounts to a "death sentence" for foreign banks.  *Cierco*,
2017 WL 2231107, at *2 (citation omitted); *see* pages 7–8, above.

In any event, there is a direct nexus.  The Rule blocked transfer of
FBME's funds from North Carolina to Cyprus.  JA0586.  Moreover, the
sweeping terms of the Rule have effectively placed FBME's funds
beyond reach by prohibiting U.S. banks from transacting with *any*
banks maintaining correspondent accounts "for, or on behalf of, FBME,"
and by instructing U.S. banks to notify their "foreign correspondent
account holders" of this prohibition; the natural consequence is that no
bank will transmit or receive FBME funds at this point.  81 Fed. Reg. at

58

18491.  The Rule thus deprives FBME of its rights to "control and use" its funds in North Carolina.  *Smith v. Simpson*, 133 S.E.2d 474, 481 (N.C. 1963).

*Third*, because this case was decided on summary judgment, FBME is entitled to all reasonable inferences on any factual question. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014).  As such, any factual doubt about whether due process attaches would need to be resolved in FBME's favor.

## II.    Violations of § 311

### A.    Failure To Consult

Before imposing the fifth special measure, § 311 requires FinCEN to engage in three rounds of consultation.  *See* pages 9–10, above. Three specified *officials* must be consulted: (1) the "Secretary of State" (for all three rounds), (2) the "Attorney General" (for two rounds), and (3) the "Chairman of the Board of Governors of the Federal Reserve System" ("**Chairman**") (for two rounds).  31 U.S.C. § 5318A(a)(4)(A), (b)(5), (c)(1).  Separately, the statute requires consultation with certain *agencies—e.g.*, the "Securities and Exchange Commission." § 5318A(a)(4)(A).  Congress thus delineated between consultations that

59

must be with specified officials and consultations that can be with any representative of a specified agency.

FinCEN failed to consult the officials specified by statute. In the Rule itself, the only reference to FinCEN's consultations was its statement that "[f]ollowing the required consultations . . . , FinCEN proposed the imposition of a prohibition under the fifth special measure in an NPRM published on *July 22, 2014*." 81 Fed. Reg. at 18488 (emphasis added). As the district court explained, this statement signals that "FinCEN consulted only before promulgating the First Final Rule and that it engaged in no new consultations following remand" in 2015—indeed, that it conducted no consultations after proposing the rule on July 22, 2014—even though FinCEN was (by its own account) deciding afresh during the 2015 remand whether to impose the fifth special measure. *FBME III*, 209 F. Supp. 3d at 325.

After FBME moved for summary judgment, the district court allowed the Government to introduce a declaration in which FinCEN official Richard May stated—in a single conclusory paragraph—that FinCEN had consulted with "representatives" of the specified officers following remand. JA0390. Relying on this *post-hoc* declaration, the

district court ruled that FinCEN had satisfied its consultation obligations. *FBME III*, 209 F. Supp. 3d at 325. The court also denied FBME's motion to examine Mr. May. *Id.* at 325 n.5.

Even if Mr. May's untested declaration is accepted, it fails to show that FinCEN consulted the correct people. The statute mandates consultation with the "Attorney General," the "Chairman," and the "Secretary of State" *themselves*, 31 U.S.C. § 5318A(a)(4)(A), (b)(5), (c)(1), but Mr. May says that FinCEN consulted only unidentified "representatives" of these officers, JA0390. Had Congress intended for consultations to be with anyone from, say, the Department of State, then the statute would have specified "Department of State"—just as it specified the "Securities and Exchange Commission"—rather than "Secretary of State." By naming a specific officer rather than that officer's agency, Congress signaled that the consultation must be with the officer, not with just anyone who works at the agency.

To be sure, when a statute names a particular officer to perform a function, that officer ordinarily can lawfully delegate the duty to a subordinate. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004); *FBME III*, 209 F. Supp. 3d at 322 n.3. The Secretary of the

Treasury has, for example, lawfully delegated to FinCEN's Director his duty to administer § 311. *See* Treasury Order 180-01 § 3(a). Here, however, the Government has never claimed that the Attorney General, the Chairman, and the Secretary of State lawfully delegated their § 311 responsibilities to the unnamed "representatives" whom FinCEN consulted. Nor, despite exhaustive research, have we located such a delegation, even though lawful delegations are ordinarily public. *E.g.*, 71 Fed. Reg. 38202, 38203 (July 5, 2006) (Secretary of State's delegation of consultation duty).

It is unlawful for a person to carry out a duty statutorily entrusted to a specific official unless that official lawfully delegated the duty to that person. *See United States v. Giordano*, 416 U.S. 505 (1974); *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997). "[C]ourts reviewing agency action must determine that 'the particular official acting on behalf of the agency [was] delegated the authority to act; otherwise such agency action is invalid.'" *League of Women Voters of the United States v. Newby*, --- F. Supp. 3d ----, 2017 WL 1273895, at *4 (D.D.C. Feb. 24, 2017) (quoting *American Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 12 (D.D.C. 2011)).

Here, FinCEN did not consult with the "Attorney General," the "Chairman," and the "Secretary of State," as § 311 requires, nor has it proven that these officials delegated their duties to the unnamed "representatives" whom FinCEN did consult. FinCEN's failure to undertake the consultations prescribed by Congress renders the Rule unlawful. *See Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006 (9th Cir. 2012) (*en banc*) (invalidating agency action for failure to satisfy statutory consultation requirements); *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 116–21 (1st Cir. 2002) (same).

## B. Failure To Consider FBME's Legitimate Business

FinCEN also ignored its § 311 obligation to consider the extent of FBME's legitimate business. 31 U.S.C. § 5318A(c)(2)(B)(ii), (a)(4)(B)(iii). Failure to consider statutory factors violates the APA. *Public Citizen v. Federal Motor Carrier Safety Administration*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

Nowhere in the administrative record does FinCEN consider the extent to which FBME is used for legitimate business. Instead, FinCEN analyzed the extent to which FMBE is used for *illegitimate* business—which is a separate statutory factor. *See* 31 U.S.C.

63

§ 5318A(c)(2)(B)(i).  Consideration of one statutory factor cannot substitute for consideration of another, even if they are related.  An agency must consider "*all* factors required by the statute."  *U.S. Department of the Interior v. FERC*, 952 F.2d 538, 546 (D.C. Cir. 1992) (emphasis added).

FinCEN's main purported analysis of FBME's legitimate business is contained in a memo supporting the Rule.  *See FBME III*, 209 F. Supp. 3d at 337.  Even there, however, FinCEN's consideration focuses not on the extent to which FBME is used for legitimate business, but instead on the number of  "high-risk customers" and the "high volume" of shell-company activity at FBME.  JA1963–65. At no point does FinCEN consider the extent of FBME's legitimate business, including the hundreds of thousands of transactions involving tens of billions of dollars that are indisputably legitimate.  JA1858–59.

FinCEN's failure to consider all of the statutory factors unlawfully skewed its analysis.  FinCEN is obliged to consider *both* illegitimate *and* legitimate business activity before imposing the fifth special measure precisely to ensure that the benefits of the chosen sanction (stamping out illegitimate activity) outweigh the costs (eliminating

64

billions of dollars of legitimate activity). By considering only the Rule's

benefits and not its costs, FinCEN unlawfully slanted its analysis

against FBME. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707–08 (2015).

## III. Arbitrariness and Caprice

Agency action is also arbitrary and capricious if it fails to

"examine the *relevant data* and articulate a rational connection between

the facts found and the choice made"; fails to "consider an important

aspect of the problem"; or proffers "an explanation for its decision that

runs counter to the evidence before it." *District Hospital Partners, L.P.

v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) (quotation marks

omitted). FinCEN's Rule evinces each of these flaws.

### A. Misuse of Suspicious Activity Reports

FinCEN's failure to disclose individual SARs is compounded by its

substantive misuse of aggregate SARs. It is important to understand

that SARs are overinclusive by design, sweeping up numerous

legitimate business transactions to ensure that all illegitimate ones are

captured too. By law, a financial institution must file a SAR for any

transaction it "knows, suspects, or has reason to suspect" involves a

"possible violation of law or regulation." 31 C.F.R. § 1020.320(a). Such

65

a metric is ill-suited to indicate whether an institution is of "*primary money laundering concern.*"

Aggregate SARs data are all the more inapt here considering shortcomings in the reports themselves. For example, a 2010 audit by the Treasury Department concluded that 59% of the SARs reviewed "had instances of missing, incomplete, inappropriate, or inconsistent information," "diminish[ing] the usefulness of the data for FinCEN, law enforcement, and other users." JA1858.

### 1. Lack of context

FinCEN altogether failed to provide the context necessary to ascribe meaning to its SARs data. The "usefulness" of statistics "depends on all of the surrounding facts and circumstances." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 (1977); *accord United States v. Archer*, 671 F.3d 149, 163–64 (2d Cir. 2011) ("[T]he government's statistics, without more, tell us very little . . . . Context is essential, but the government did not take the time and make the effort to provide any."). Viewing statistics in a vacuum is folly.

FinCEN accused FBME of having a "significant" volume of SARs activity in 2006–2014—reporting 4,500 suspicious transfers totaling $875 million between November 2006 and March 2013, and a further $387 million in suspicious transfers between April 2013 and April 2014, 79 Fed. Reg. at 42640—yet these transfers amounted to fewer than 1% of the more than 900,000 U.S. dollar transactions (totaling over $124 billion) that FBME conducted during this period.  JA1858–59.

No volume of suspicious transactions is inherently "significant." As the district court noted after reviewing the Rule, "FinCEN provides no comparative benchmarks referencing other banks to support its assertions that FBME has a 'large number' of shell company customers or that the Bank has facilitated a 'high volume' of U.S. dollar transactions by such shell companies." *FBME III*, 209 F. Supp. 3d at 333 (citation omitted).  "Nor does the agency attempt to explain why such benchmarks may be unnecessary, or infeasible to provide, or how else the agency may have applied its expertise and regulatory experience in the absence of specific benchmarks." *Id.*  Before ordering the second remand, the district court perfectly summarized FinCEN's inscrutable use of SARs data:

67

> THE COURT:  But what is the agency's judgment?  I mean, if the EPA says, 'We find that someone dumped, you know, 300 million gallons of a toxic material,' and that's the basis of a rule-making in an adverse finding, how is the Court to know whether that's a high amount?  A low amount?  How can I assess FinCEN's exercise of its discretion if it's just a raw number with no benchmark? That's what I'm struggling with.

JA0356.  Because FinCEN *still* has not provided the "benchmark" necessary to evaluate whether FBME's raw SARs rate is "high" or "low," the agency's use of SARs data remains arbitrary and capricious.  *See Allen v. Murray-Lazarus*, 755 F. Supp. 2d 480, 486 (S.D.N.Y. 2010) ("[T]he statistics are presented here in a vacuum, devoid of other information, which renders it impossible to draw meaningful inferences . . . from them."); *Collier v. Bradley University*, 113 F. Supp. 2d 1235, 1238 (C.D. Ill. 2000) ("For statistical evidence to have any meaning, there must be a baseline for comparison.").

    In its post-remand Supplement, FinCEN refused to place the SARs data in context for three reasons:  (1) "in absolute terms," the volume of SARs regarding shell-company activity at FBME was "substantial"; (2) comparing FBME to other banks "would not necessarily portray the relevant risk posed by FBME"; and (3) "setting a

benchmark . . . could simply set a target for banks or customers wishing to evade money laundering controls."  81 Fed. Reg. at 86578–79.

None of these explanations is reasonable.  Take the first point: the use of absolute terms.  Whether a number is "substantial" is relative.  Absent an appropriate comparison, it is impossible to say what a healthy SARs rate *should* be.  That was precisely the point the district court made when explaining that a benchmark is necessary to know whether FBME has a "large number" of shell-company customers or that it facilitated a "high volume" of transactions by such companies. *FBME III*, 209 F. Supp. 3d at 333.  So long as FinCEN refuses to supply a baseline or benchmark, it is specious to insist that FBME's SARs rate is "substantial," any more than the SARs rate of every functioning international bank in the world is "substantial."  "Without a baseline, there's no way to tell whether" FBME's SARs rate "is low, high or on a par with other[s who are similarly situated]." *In re Complaint of Judicial Misconduct*, 687 F.3d 1188, 1189 (9th Cir. 2012).

FBME has submitted, and FinCEN has not denied, that the volume of SARs for FBME is substantially lower than for comparable banks.  JA1859.  Punishing FBME despite a lower SARs rate than peer

banks is consistent with the findings in the report of the U.S.
Government Accountability Office that FinCEN targets banks
arbitrarily, even while worse banks go unpunished. *See* pages 8–9,
above.

FinCEN virtually concedes that FBME's SARs rate is
comparatively low when it asserts, as its second point, that "a
comparison of SARs filed on FBME compared to other Cypriot financial
institutions would not necessarily portray the relevant risk posed by
FBME." 81 Fed. Reg. at 86579. In other words, FinCEN refuses to
present a comparison because FBME would not look as risky as
similarly situated banks, which in turn would (as the district court
noted) "undermine FinCEN's conclusion that the 'volume' of money
laundering transactions facilitated by the Bank was 'significant' or
'substantial,' making it of 'primary' money-laundering concern." *FBME
III*, 209 F. Supp. 3d at 334. It is arbitrary and capricious for an agency
to rely on data but withhold "parts that signal caution about that data."
*American Radio Relay*, 524 F.3d at 239; *accord Walter O. Boswell
Memorial Hospital v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984)
(agency cannot withhold "information adverse to it").

70

FinCEN's third rejoinder is that setting a benchmark "could simply set a target for banks or customers wishing to evade money laundering controls." 81 Fed. Reg. at 86579. Such reasoning is perverse. It would be a *feature*, not *a bug*, if announcing a baseline had the effect of *decreasing* suspicious transactions below a specified level—a level that FinCEN could set at whatever threshold it determined was safe and appropriate. FinCEN's worry that institutions would relax AML controls when they neared the threshold is unfounded. SARs reports are confidential. *See* 31 U.S.C. § 5318(g). A bank would therefore never know where it stands relative to the threshold. And, of course, banks would still be subject to the multitude of other AML requirements that would ensure they remain vigilant in combatting money laundering. In short, FinCEN has offered no better justification than other agencies do for withholding reasoned guidance or compliance thresholds.

## 2.    Failure to account for the Cypriot financial crisis

The lack of a benchmark is especially egregious because, without a way to standardize the statistical data, FinCEN ignored confounding variables, including a major event that ostensibly skewed all SARs data

in 2013–2014:  the Cypriot financial crisis made *all* Cypriot banks,
including FBME, likelier to trigger SARs.

In response to the Cypriot financial crisis, stringent regulatory
controls were imposed on Cypriot banks, limiting the withdrawal rates
for depositors.  JA1860.  New withdrawal patterns emerged, with
depositors withdrawing the maximum amount permissible on a regular
basis; these new patterns could easily have been mistaken for
suspicious patterns associated with money laundering.  JA1860.

FinCEN ignored this confounding factor in both the Rule, *see*
*FBME III*, 209 F. Supp. 3d at 333, and the Supplement.  In the
Supplement, FinCEN claims that it "did not rely on any suggestion that
the number of SAR filings involving FBME increased during the
Cypriot financial crisis as compared to past periods in the analysis."  81
Fed. Reg. at 86578.  This is simply false.  The Second Rule places a
premium on SAR activity in 2013–2014, *see* 81 Fed. Reg. at 18489,
which is precisely when the Cypriot financial crisis and its aftermath
occurred.  No other one-year period is examined in the Second Rule, and
the conspicuous spike in SARs rate during that year is particularly
paramount to FinCEN's conclusions.

Similarly, FinCEN's contention that the suspected shell activity that informed its decision "was not limited to the period of the Cypriot financial crisis" misses the point; the *cumulative* total of suspicious transactions that FinCEN attributed to FBME for 2006–2014 was bloated by the Cypriot financial crisis, and the pronounced spike for 2013–14 resulted. 81 Fed. Reg. at 86578. When, as here, an agency "ignor[es] altogether a variable so clearly relevant and likely to affect" the conclusion the agency reaches, the resulting decision is "arbitrary and capricious." *Comcast Corp. v. FCC*, 579 F.3d 1, 7–8 (D.C. Cir. 2009).

## B.    Misuse of Audit Reports

The Rule is also arbitrary and capricious in analyzing the reports from EY and KPMG. According to FinCEN, "the KPMG and EY audits that FBME provided to FinCEN show a pattern of recurring AML deficiencies at the bank." 81 Fed. Reg. at 18483.

Contrary to FinCEN's account, KPMG and EY found FBME consistently cooperative and compliant with applicable laws. JA1148–50, 1325. The auditors included recommendations for *additional improvements* above and beyond what was required by law, not any

73

findings of "AML deficiencies." FBME took those recommendations constructively and swiftly sought to implement them. *E.g.*, JA1369–71, 1460–64, 1850–52, 1874–1904. Yet FinCEN cherry-picked recommendations, such as the suggestion to "modify[] [FBME's] periodic customer due diligence process to align with industry practices," 81 Fed. Reg. at 18484, while ignoring important qualifications, such as EY's explicit acknowledgment that this suggested modification was "not required" by law. JA1325. By presenting these *recommendations* as "*deficiencies*"—a word that implies noncompliance—FinCEN framed its decision in a manner "that runs counter to the evidence before it." *District Hospital*, 786 F.3d at 56–57 (citation omitted).

FinCEN's misuse of these audit reports is especially pernicious in discouraging foreign banks from enlisting independent auditors for fear that the resulting reports will be turned against them. Rather than acknowledging the substantial AML compliance that the auditors found and the further steps FBME undertook to implement the auditors' recommendations, FinCEN selectively quoted negative language to further support its preordained adverse conclusions.

### C.    Improper Reliance on the Central Bank of Cyprus

Finally, FinCEN violated the APA by blankly crediting findings prepared by a biased source:  CBC, an entity that has long pursued an illegal campaign to destroy FBME.

The unrelenting hostility CBC has exhibited against FBME is pervasive and well-documented.  *See* pages 14–16, above.  The most flagrant example of CBC's attempts to sabotage FBME is its commandeering of the 2014 examination by PricewaterhouseCoopers. *See* pages 21–22, above.  In brief, CBC retained PricewaterhouseCoopers to conduct the annual examination of FBME in 2014 that discovered no serious issues.  CBC nevertheless ignored those initial findings and, in 2015—after FBME had commenced legal proceedings against CBC for hundreds of millions of dollars—produced a report criticizing FBME's AML program.  JA1692–1718.  Remarkably, PricewaterhouseCoopers "note[d] that we have neither authored *nor seen* the report."  JA1753 (emphasis added).  In other words, CBC took free reign to manipulate the examination findings to bash FBME and insulate itself against litigation exposure.

Although FBME notified FinCEN of CBC's bias (including CBC's vested pecuniary interest in seeing FinCEN sanction FBME) and of the suspect nature of this 2015 report, the report nevertheless occupied a prominent place in the Rule:

> The CBC independently identified many of these same concerns during an on-site AML examination of FBME's Cyprus branch conducted from June to September 2014.

81 Fed. Reg. at 18482.  The troubling irregularities behind the report—including the disavowal by PricewaterhouseCoopers, the independent auditor hired to conduct the audit, of involvement in any aspect of the report—went unmentioned.  By embracing such a one-sided, partisan source, FinCEN acted arbitrarily and capriciously.

CBC's foremost motive is all too obvious:  money.  CBC has tried repeatedly to seize FBME's assets and transfer them to the Cypriot government, in violation of Cypriot and international law.  JA1831–34.  To remedy CBC's lawlessness, FBME's shareholders have commenced an arbitration seeking hundreds of millions of dollars in damages.  JA1378–82.  CBC's central defense is that FinCEN's imposition of the fifth special measure caused the shareholders' damages, thereby adding

to CBC's powerful pecuniary incentive to do everything in its power to ensure that the Rule takes effect. JA1837–39.

Third parties who do not have a stake in this case have decried CBC's behavior: A former Governor of CBC commented that "the diminished independence of the central bank and . . . toxic politics . . . may well have contaminated the decision making process at the CBC, pushing it away from strict banking considerations and into the realm of party and interest group politics." JA1800. The Tanzanian central bank's statutory manager called CBC's actions "illegal" and noted that CBC created a "mess by acting unilaterally and prematurely" against FBME. JA1720. And FBME's former investigators told FinCEN that CBC commissioned their betrayal of FBME in secretly divulging privileged communications to and from the undersigned counsel. JA0938.

Confronted with hard evidence discrediting CBC, FinCEN offered a feeble defense, asserting that "CBC has received positive reviews" from "MONEYVAL."[8] 81 Fed. Reg. at 18487–88. In reality, though, the

---

[8] "MONEYVAL" stands for the Committee of Experts on the Evaluation of Anti-Money Laundering and the Financing of Terrorism. 81 Fed. Reg. at 18485 n.13.

2011 MONEYVAL review that FinCEN relies on *criticizes* CBC and
other Cypriot "supervisory authorities," concluding that the inadequate
"human, financial and technical resources" they allocate to AML
matters is "particularly worrisome."  MONEYVAL, *Report on Fourth
Assessment Visit* 15 (Sept. 27, 2011), https://goo.gl/UHO9U6.  That
FinCEN cites this report as supposedly praising CBC speaks volumes
about CBC's dubious stature and the skewed way in which FinCEN
conducted its rulemaking.  Notably, FinCEN has taken no account
whatsoever of CBC's demonstrated pattern of misconduct specifically
relative to FBME and this proceeding.

   That FinCEN so eagerly embraced CBC is, unfortunately, part
and parcel of a disturbing pattern of synchronization.  Besides
importing tainted findings from CBC into the Second Rule, FinCEN has
played a game of hot potato with CBC, with each regulator pinning the
blame of FBME's demise on the other in order to escape legal
accountability.  JA1837.

   "[O]bvious bias" warrants more stringent application of the
arbitrary and capricious standard.  *Zevallos v. Obama*, 793 F.3d 106,
112 (D.C. Cir. 2015).  FinCEN's unexamined embrace of a biased

regulator in order to condemn FBME was arbitrary and capricious, and renders the deficiencies in FinCEN's process that much more problematic—FBME never had chance to confront its central accuser abroad, just as FinCEN took no meaningful account of CBC's demonstrated bias and credibility deficit before adopting its inputs.

## IV.  Vacatur Is Proper

A successful APA challenger is "normally" entitled to "vacatur of the agency's order." *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001).  Yet this Court "sometimes decline[s] to vacate an agency's action" depending on the "seriousness of the order's deficiencies" and the "likely disruptive consequences of vacatur." *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (citations and quotation marks omitted).

Neither factor favors the Government.  First, FinCEN's deficiencies are profound:  reliance on secret, untested evidence threatens erroneous deprivation, which is why this Court considers "deficient notice [to be] a 'fundamental flaw' that almost always requires vacatur." *Id.* (quoting *Heartland Regional Medical Center v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)).  Vacatur is also the

79

"typical remedy for an arbitrary and capricious agency action." *St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 208 (D.D.C. 2015). The serial notice violations in this case (Section I, above) and persisting arbitrariness and caprice (Sections II & III, above) weigh sharply in favor of vacatur.

Second, vacatur would not be disruptive; the Government was content to go without the Rule for long stretches. After first proposing a rule in July 2014 (79 Fed. Reg. 42486), it waited a *full year* before finalizing it in July 2015 (80 Fed. Reg. 45057). When that rule was enjoined, FinCEN did not "appeal the injunction, move for reconsideration, or continue to defend its rulemaking," but instead sought a voluntary remand that left the injunction in force. *FBME II*, 142 F. Supp. 3d at 72. After the second Rule issued, the district court stayed it pending further deliberations, *see* JA0391, then further stayed it pending a second remand, *see FBME III*, 209 F. Supp. 3d at 341–43, yet still FinCEN did not protest. If implementing the Rule were urgent, the Government would not have tarried for three years.

Moreover, FBME's heavily constrained and monitored state—with ongoing control and supervision by regulators in Cyprus and Tanzania,

and individual transactions strictly limited and policed—ensures

against any risk of money laundering.  JA0580–83.  More so than in the

typical case, therefore, vacatur is proper here.

CONCLUSION

This Court should reverse and remand with instructions to vacate the Rule.

Respectfully submitted,

HOGAN LOVELLS US LLP

QUINN EMANUEL URQUHART & SULLIVAN LLP

*/s/ Derek L. Shaffer*

Peter S. Spivack
J. Evans Rice III
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600

Derek L. Shaffer
William A. Burck
Jonathan G. Cooper
777 Sixth Street NW, 11th Floor
Washington, DC 20001
(202) 538-8000

Dated: June 7, 2017

*Counsel for Plaintiffs-Appellants
FBME Bank Ltd. and FBME Ltd.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirement of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it is written in 14-point Century Schoolbook font, a proportionately spaced font.

I further certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) and this Court's Order of May 30, 2017, ECF 1677160 (authorizing opening briefs in this appeal to be 15,000 words), because it contains 14,953 words, excluding the parts exempted from length limits by Rule 32(f).

*/s/ Derek L. Shaffer*
Derek L. Shaffer

*Counsel for Plaintiffs-Appellants*
*FBME Bank Ltd. and FBME Ltd.*

# ADDENDUM

## Table of Contents

**Provision**                                                                 **Page**

31 U.S.C. § 5318A. ..........................................................................ADD-1

**31 U.S.C. § 5318A.  Special measures for jurisdictions, financial institutions, international transactions, or types of accounts of primary money laundering concern.**

**(a) International counter–money laundering requirements.**—

**(1) In general.**—The Secretary of the Treasury may require domestic financial institutions and domestic financial agencies to take 1 or more of the special measures described in subsection (b) if the Secretary finds that reasonable grounds exist for concluding that a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts is of primary money laundering concern, in accordance with subsection (c).

**(2) Form of requirement.**—The special measures described in—

**(A)** subsection (b) may be imposed in such sequence or combination as the Secretary shall determine;

**(B)** paragraphs (1) through (4) of subsection (b) may be imposed by regulation, order, or otherwise as permitted by law; and

**(C)** subsection (b)(5) may be imposed only by regulation.

**(3) Duration of orders; rulemaking.**—Any order by which a special measure described in paragraphs (1) through (4) of subsection (b) is imposed (other than an order described in section 5326)—

**(A)** shall be issued together with a notice of proposed rulemaking relating to the imposition of such special measure; and

**(B)** may not remain in effect for more than 120 days, except pursuant to a rule promulgated on or before the end of the 120–day period beginning on the date of issuance of such order.

**(4) Process for selecting special measures.**—In selecting which special measure or measures to take under this subsection, the Secretary of the Treasury—

> **(A)** shall consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency (as defined in section 3 of the Federal Deposit Insurance Act) the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the National Credit Union Administration Board, and in the sole discretion of the Secretary, such other agencies and interested parties as the Secretary may find to be appropriate; and

> **(B)** shall consider—

>> **(i)** whether similar action has been or is being taken by other nations or multilateral groups;

>> **(ii)** whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

>> **(iii)** the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and

>> **(iv)** the effect of the action on United States national security and foreign policy.

**(5) No limitation on other authority.**—This section shall not be construed as superseding or otherwise restricting any other authority granted to the Secretary, or to any other agency, by this subchapter or otherwise.

ADD-2

**(b) Special measures.**—The special measures referred to in subsection (a), with respect to a jurisdiction outside of the United States, financial institution operating outside of the United States, class of transaction within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts are as follows:

> **(1) Recordkeeping and reporting of certain financial transactions.**—
>
>> **(A) In general.**—The Secretary of the Treasury may require any domestic financial institution or domestic financial agency to maintain records, file reports, or both, concerning the aggregate amount of transactions, or concerning each transaction, with respect to a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, class of transactions, or type of account to be of primary money laundering concern.
>>
>> **(B) Form of records and reports.**—Such records and reports shall be made and retained at such time, in such manner, and for such period of time, as the Secretary shall determine, and shall include such information as the Secretary may determine, including—
>>
>>> **(i)** the identity and address of the participants in a transaction or relationship, including the identity of the originator of any funds transfer;
>>>
>>> **(ii)** the legal capacity in which a participant in any transaction is acting;
>>>
>>> **(iii)** the identity of the beneficial owner of the funds involved in any transaction, in accordance with such procedures as the Secretary determines to be reasonable and practicable to obtain and retain the information; and

**(iv)** a description of any transaction.

**(2) Information relating to beneficial ownership.**—In addition to any other requirement under any other provision of law, the Secretary may require any domestic financial institution or domestic financial agency to take such steps as the Secretary may determine to be reasonable and practicable to obtain and retain information concerning the beneficial ownership of any account opened or maintained in the United States by a foreign person (other than a foreign entity whose shares are subject to public reporting requirements or are listed and traded on a regulated exchange or trading market), or a representative of such a foreign person, that involves a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, or transaction or type of account to be of primary money laundering concern.

**(3) Information relating to certain payable–through accounts.**—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens or maintains a payable–through account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a payable through account through which any such transaction may be conducted, as a condition of opening or maintaining such account—

   **(A)** to identify each customer (and representative of such customer) of such financial institution who is permitted to use, or whose transactions are routed through, such payable–through account; and

**(B)** to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

**(4) Information relating to certain correspondent accounts.**—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens or maintains a correspondent account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a correspondent account through which any such transaction may be conducted, as a condition of opening or maintaining such account—

**(A)** to identify each customer (and representative of such customer) of any such financial institution who is permitted to use, or whose transactions are routed through, such correspondent account; and

**(B)** to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

**(5) Prohibitions or conditions on opening or maintaining certain correspondent or payable–through accounts.**—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary, in consultation with the Secretary of State, the Attorney General, and the Chairman of the

Board of Governors of the Federal Reserve System, may prohibit, or impose conditions upon, the opening or maintaining in the United States of a correspondent account or payable– through account by any domestic financial institution or domestic financial agency for or on behalf of a foreign banking institution, if such correspondent account or payable–through account involves any such jurisdiction or institution, or if any such transaction may be conducted through such correspondent account or payable– through account.

**(c) Consultations and information to be considered in finding jurisdictions, institutions, types of accounts, or transactions to be of primary money laundering concern.**—

**(1) In general.**—In making a finding that reasonable grounds exist for concluding that a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts is of primary money laundering concern so as to authorize the Secretary of the Treasury to take 1 or more of the special measures described in subsection (b), the Secretary shall consult with the Secretary of State and the Attorney General.

**(2) Additional considerations.**—In making a finding described in paragraph (1), the Secretary shall consider in addition such information as the Secretary determines to be relevant, including the following potentially relevant factors:

**(A) Jurisdictional factors.**—In the case of a particular jurisdiction—

(i) evidence that organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles have transacted business in that jurisdiction;

(ii) the extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank

secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

(iii) the substance and quality of administration of the bank supervisory and counter–money laundering laws of that jurisdiction;

(iv) the relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

(v) the extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

(vi) whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of United States law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

(vii) the extent to which that jurisdiction is characterized by high levels of official or institutional corruption.

**(B) Institutional factors.**—In the case of a decision to apply 1 or more of the special measures described in subsection (b) only to a financial institution or institutions, or to a transaction or class of transactions, or to a type of account, or to all 3, within or involving a particular jurisdiction—

(i) the extent to which such financial institutions, transactions, or types of accounts are used to facilitate or promote money laundering in or through the jurisdiction, including any money laundering activity by organized criminal groups, international terrorists,

ADD-7

or entities involved in the proliferation of weapons of mass destruction or missiles;

(ii) the extent to which such institutions, transactions, or types of accounts are used for legitimate business purposes in the jurisdiction; and

(iii) the extent to which such action is sufficient to ensure, with respect to transactions involving the jurisdiction and institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

**(d) Notification of special measures invoked by the Secretary.**—Not later than 10 days after the date of any action taken by the Secretary of the Treasury under subsection (a)(1), the Secretary shall notify, in writing, the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate of any such action.

**(e) Definitions.**—Notwithstanding any other provision of this subchapter, for purposes of this section and subsections (i) and (j) of section 5318, the following definitions shall apply:

>**(1) Bank definitions.**—The following definitions shall apply with respect to a bank:

>>**(A) Account.**—The term "account"—

>>>(i) means a formal banking or business relationship established to provide regular services, dealings, and other financial transactions; and

>>>(ii) includes a demand deposit, savings deposit, or other transaction or asset account and a credit account or other extension of credit.

>>**(B) Correspondent account.**—The term "correspondent account" means an account established to receive deposits

from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution.

**(C) Payable–through account.**—The term "payable–through account" means an account, including a transaction account (as defined in section 19(b)(1)(C) of the Federal Reserve Act), opened at a depository institution by a foreign financial institution by means of which the foreign financial institution permits its customers to engage, either directly or through a subaccount, in banking activities usual in connection with the business of banking in the United States.

**(2) Definitions applicable to institutions other than banks.**—With respect to any financial institution other than a bank, the Secretary shall, after consultation with the appropriate Federal functional regulators (as defined in section 509 of the Gramm–Leach–Bliley Act), define by regulation the term "account", and shall include within the meaning of that term, to the extent, if any, that the Secretary deems appropriate, arrangements similar to payable–through and correspondent accounts.

**(3) Regulatory definition of beneficial ownership.**—The Secretary shall promulgate regulations defining beneficial ownership of an account for purposes of this section and subsections (i) and (j) of section 5318. Such regulations shall address issues related to an individual's authority to fund, direct, or manage the account (including, without limitation, the power to direct payments into or out of the account), and an individual's material interest in the income or corpus of the account, and shall ensure that the identification of individuals under this section or subsection (i) or (j) of section 5318 does not extend to any individual whose beneficial interest in the income or corpus of the account is immaterial.

**(4) Other terms.**—The Secretary may, by regulation, further define the terms in paragraphs (1), (2), and (3), and define other

terms for the purposes of this section, as the Secretary deems appropriate.

**(f) Classified information.**—In any judicial review of a finding of the existence of a primary money laundering concern, or of the requirement for 1 or more special measures with respect to a primary money laundering concern, made under this section, if the designation or imposition, or both, were based on classified information (as defined in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.), such information may be submitted by the Secretary to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review of any finding made or any requirement imposed under this section.

## CERTIFICATE OF SERVICE

I certify that, on June 7, 2017, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Derek L. Shaffer*
Derek L. Shaffer

*Counsel for Plaintiffs-Appellants*
*FBME Bank Ltd. and FBME Ltd.*